## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

```
------------------------------------------------------------- x
ABBOTT LABORATORIES,                      :
                                          :
                        Plaintiff         : Civil Action No. _____
                                          :
        v.                                :
                                          :
REVITALYTE LLC,                           :
                                          :
                        Defendant.        :
------------------------------------------------------------- x
```

## COMPLAINT

Plaintiff Abbott Laboratories ("Abbott"), for its complaint against Defendant Revitalyte LLC ("Revitalyte"), alleges as follows:

## NATURE OF ACTION

1.      This is an action for unfair competition, deceptive business practices, trade dress infringement, trademark infringement, and dilution by tarnishment in violation of federal and Minnesota law.

2.      Abbott is a more than century-old health care company with a broad portfolio of premium brands.  Among Abbott's most enduring products is an oral electrolyte solution ("OES") that Abbott markets and sells under its world-famous Pedialyte® trademark.  For more than fifty years, Pedialyte has led the OES category, as consumers have associated the brand with a safe, effective, and palatable beverage for mild to moderate dehydration. Thanks to Abbott's years of investment in promoting Pedialyte and ensuring the product's quality, the brand now enjoys tremendous consumer trust and goodwill.

14140600

3.    The flagship ready-to-drink Pedialyte product also has a distinctive look and feel, which has been largely unchanged for decades, and has itself elicited widespread consumer trust and recognition.  The product's distinctly shaped translucent plastic bottle; the color scheme, placement, and size of the wrap-around label encircling the bottle and bearing the Pedialyte mark; the ridges in the bottle above and below the wrap-around label; the shrink-wrapped cap; the bright and translucent colors of the visible product within the bottle; and the more muted color palette of the wrap-around label all contribute to the unique overall look and feel of the product.  This trade dress has become indelibly linked with the Pedialyte brand in consumers' minds, and courts have repeatedly found it to have secondary meaning.

4.    Revitalyte is a Minnesota company whose only product, also called Revitalyte, is a competing OES  with a similar formula to Pedialyte.  Revitalyte is not the first company to sell an OES product that competes with Pedialyte, the longtime category leader.  But rather than positioning its product as an *alternative* to Pedialyte, as other competitors have, Revitalyte explicitly and wrongfully presents its product as a new *version* of Pedialyte, so as to ride the coattails of the world-famous Pedialyte brand.

5.    From the outset, as Revitalyte's co-founder explained in an interview, the company recognized the difficulty of generating its own brand equity, so it decided to freeload off Pedialyte's instead.  Revitalyte's initial objective was to capture "the look and feel" of Pedialyte with its product, thereby convincing consumers that its product was "the adult version of Pedialyte"—particularly for young adults seeking to rehydrate after

2

excessive alcohol consumption.  In other words, from day one, Revitalyte's strategic plan was to trade on the goodwill that Abbott has cultivated in the Pedialyte brand.

6.      Revitalyte has aggressively pursued that strategy, and is continuing to do so today.  Revitalyte's OES has the very same "look and feel" that consumers have associated with Pedialyte for decades.  Revitalyte's product comes in a bottle of ***identical*** shape and appearance to the Pedialyte bottle; features a wrap-around label of identical size, configuration, and color scheme; is available in the same flavors as Pedialyte; and has the same bright, translucent colors visible through the bottle.  This trade dress features prominently in Revitalyte's marketing materials, so as to elicit consumer recognition and enable Revitalyte to reap the full benefits of Pedialyte's trade dress.

 

7.      Revitalyte does everything possible to exploit the commercial value of this trade dress and its associations with the Pedialyte brand.  According to Revitalyte's "Promotional Guide" for 2021, highly visible in-store displays of the infringing trade dress are "critical for driving sell-through, as ***Revitalyte [OES] leverages its resemblance to***

3

***Pedialyte to catch the consumer[']s eye and close the add-on purchase***." Thus, Revitalyte explicitly trades on the "look and feel" of Pedialyte to sell its own product.

8.     The "Promotional Guide," along with other damning admissions, came to light recently in a separate infringement case that another OES competitor, Vitalyte, pursued against Revitalyte.[1]  Vitalyte alleged that Revitalyte's confusingly similar name infringed its trademark, and in February 2023, the Vitalyte court denied Revitalyte's motion for summary judgment on that claim.  The parties entered into a settlement agreement a few months later but the 2021 Promotional Guide was filed in August 2022 in connection with the briefing on that motion.  Thus, while unsuccessfully defending against Vitalyte's infringement claims, Revitalyte exposed its deliberate and willful efforts to infringe ***Pedialyte's*** trade dress.

9.     Revitalyte's infringement of Abbott's intellectual property does not stop with the Pedialyte trade dress.  In a complementary plank of this "trade on Pedialyte" strategy, Revitalyte also makes extensive and creative use of the Pedialyte trademark to promote its competitive product.  Per its founder's vision, Revitalyte explicitly touts its product as "***the adult version of Pedialyte***" for young adults with hangovers.  Its website and social media accounts promise consumers that they can now get their "***Pedialyte***" without "embarrassing trips to the baby aisle" of their local drugstores or supermarkets.   And Revitalyte

---

[1] *Vitalyte Sports Nutrition Inc. v. Revitalyte LLC*, No. 3:21-cv-00880-JO-BGS (S.D. Cal.).

4

enthusiastically retweets various mentions of *Pedialyte* as a hangover balm, as if its product is sponsored, approved, or endorsed by Pedialyte.

10.     Revitalyte's persistent appropriation of Abbott's world-famous trademark and trade dress is likely to confuse consumers, creating the perception of a link between Revitalyte and Pedialyte, when no such link exists.  Indeed, this confusion is already on display on Revitalyte's social media channels, where consumers routinely refer to Revitalyte's OES as "adult Pedialyte," and sometimes directly ask Revitalyte whether its OES is a Pedialyte product or not.  Rather than dispelling these instances of confusion, Revitalyte has encouraged them, by retweeting the "Pedialyte" references and responding evasively to consumers' queries on this point.  Revitalyte appears to view these episodes as confirmation that its marketing strategy is going as planned.

11.     Revitalyte has harmed Abbott by confusing consumers into believing its product is "a version of" Pedialyte, and likely inducing some consumers to purchase Revitalyte's OES under that false pretense.  Revitalyte's infringement of Abbott's trademark and trade dress is inflicting harm in the form of diminished brand equity and lost sales, and will continue to do so unless enjoined.  This harm is difficult to quantify with precision and cannot be fully redressed through monetary relief.

12.     In addition, Revitalyte has tarnished the well-respected Pedialyte trademark through its crass, irresponsible, and vulgar marketing.  Not only does Revitalyte urge young adults to turn to "the adult version of Pedialyte" (*i.e.*, Revitalyte's OES) when suffering the after-effects of excessive drinking, but—far more troublingly—it actively encourages

5

them to engage in excessive drinking in the first place. Revitalyte's social media and marketing communications celebrate getting "f—ed up" and "blackout," describe hangovers as "inevitable" occurrences each weekend, and glorify evenings of "15 vodka tonnys" or "15 beers," among other things. Rather than presenting excessive drinking as a regrettable error that Revitalyte's OES can help consumers recover from, these ads portray excessive drinking as a desirable objective, and Revitalyte's OES as the means to facilitate it.

13.    If Revitalyte wishes to promote a competitive OES product by encouraging binge drinking among young adults, that is its business. But by associating the Pedialyte brand and dress with that marketing strategy, it has tarnished and diluted Abbott's trademark. Abbott has invested many decades and millions of dollars in establishing Pedialyte as a trustworthy, high-quality health-care brand for children and adults. As a result, consumers turn to Pedialyte in many situations, some of which are highly sensitive. Pedialyte has earned the trust of many different types of consumers, ranging from parents whose small children have vomited to the point of dehydration to adults with mild to moderate dehydration caused by vomiting, diarrhea, exercise, travel or heat exhaustion. Consumers trust Pedialyte for these critical needs because of the goodwill Abbott, a venerable health-care company, has accrued in the brand. Revitalyte diminishes that goodwill by linking the Pedialyte name and dress to its reckless and ill-advised encouragement of excessive drinking.

14140600

14.     Each of these forms of unfair competition—Revitalyte's trading on the Pedialyte trademark and trade dress, and its tarnishment of the Pedialyte name through association with pro-binge-drinking advertising campaigns—are inflicting, and unless curtailed will continue to inflict, harm on Abbott and its business that cannot be compensated through monetary damages.  This harm includes, but is not limited to, consumer confusion resulting in lost sales and reduced brand loyalty; diminution of the strength of Abbott's world-famous Pedialyte trademark; loss of consumer confidence and trust in the Pedialyte brand; and loss of distribution outlets.

15.     In addition, Revitalyte has unjustly retained ill-gotten profits from the sale of its infringing OES product.

16.     These acts of unfair competition violate the Lanham Act, 15 U.S.C. §§ 1114 and 1125, as well as the Minnesota Deceptive Trade Practices Act.

17.     Abbott brings this action to stop Revitalyte from further misinforming and confusing the public, to protect Pedialyte's goodwill, to enjoin Revitalyte from infringing and diluting Pedialyte's trademark and trade dress and otherwise engaging in unfair competition, to compel Revitalyte to engage in corrective advertising to stem the damage it has already caused, and to obtain disgorgement of Revitalyte's ill-gotten profits.

## PARTIES

18.     Abbott is a corporation organized under the laws of the State of Illinois, having its headquarters and principal place of business at 100 Abbott Park Road, Abbott Park, Illinois 60064.  Abbott has developed and sold its Pedialyte products for more than

50 years.  Pedialyte is available for sale throughout the District, the State of Minnesota, the United States, and the world.

19.    Revitalyte is a Minnesota corporation with its principal place of business in St. Louis Park, Minnesota.  Revitalyte is in the business of selling and promoting a competitive OES called Revitalyte.  Revitalyte's OES is available for sale throughout the District, the State of Minnesota, and the United States.

## JURISDICTION AND VENUE

20.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338, in that this is a civil action for violations of the Lanham Act, 15 U.S.C. §§ 1114 and 1125.

21.    This Court has subject matter jurisdiction over Plaintiff's Minnesota deceptive trade practices claims (Minnesota Statute § 325D.44) pursuant to 28 U.S.C. §§ 1338(b) and 1367(a).

22.    Venue is proper in this district under 28 U.S.C. §§ 1391 and 1400.

23.    This Court has general personal jurisdiction over Revitalyte, because Revitalyte is a corporation organized under the laws of Minnesota, with its principal place of business in Minnesota.

14140600

# FACTS

## I. Abbott's Development of the Pedialyte® Brand

24.    Since its founding in 1888, Abbott has developed a broad portfolio of innovative and high-quality health-care brands.  One of these is Pedialyte®, an OES that was launched in 1966, and remains one of Abbott's most popular brands.

### *Pedialyte's Creation of the Enduring OES Product Category*

25.    Pedialyte was developed based on rehydration therapies invented by the World Health Organization in the 1940s.  Pedialyte contains an optimal balance of sodium, sugar, potassium, water, and other electrolytes—mineral nutrients that help to maintain the body's fluid and electrolyte levels.  These electrolytes often become depleted in dehydrated individuals, so Pedialyte is designed to replenish them.  The water in Pedialyte rehydrates while the sugar helps pull the salt, potassium, and other electrolytes into the body to rehydrate the individual.

26.    Initially, Pedialyte was primarily seen as an affordable product for mild to moderate dehydration caused by the vomiting and diarrhea associated with gastrointestinal illness.  The product was originally used primarily for the treatment of children, whose naive immune systems make them particularly susceptible to these types of conditions.

27.    OES products were not widely known or available at the time of Pedialyte's release, so Pedialyte was a cutting-edge and unique product.  Although Pedialyte was initially sold only to medical establishments, by approximately 1970 it had been introduced in consumer retail channels, making it the first such product to be widely commercially

14140600

available in the United States.  The United States Patent and Trademark Office first approved Abbott's trademark application for "Pedialyte" in 1974 for "electrolyte replacement solutions."  Today, Abbott holds multiple trademark registrations for "Pedialyte."[2]

28.    Over the decades, Abbott has educated consumers about the benefits of OES products and established widespread goodwill in connection with the Pedialyte brand. As a result, consumers today are far more cognizant of the benefits of OES products than they were at the time of Pedialyte's launch.  OES products also continue to be recommended by leading health authorities for mild to moderate dehydration.

29.    Although OES products have emerged as a solution for dehydrated adults, they have also remained broadly popular among parents seeking assistance with their sick children suffering from mild to moderate dehydration, the original use for which Pedialyte was promoted.  Today, more than half a century after Abbott created the OES category in the United States by introducing Pedialyte, leading health authorities continue to recommend OES for this crucial purpose.

30.    The Mayo Clinic, a nationally recognized nonprofit medical center, says on its website that "[t]he *only effective treatment* for dehydration is to replace lost fluids and

---

[2] *See* USPTO Serial Numbers 97655600, 97559039, 88006101, 87424951, 87424943, 86680448, 85889482, and 78653655.

lost electrolytes…For infants and children who have become dehydrated from diarrhea, vomiting or fever, use an over-the-counter oral rehydration solution."[3]

31.    The American Academy of Pediatrics likewise recommends OES as the "preferred treatment of mild to moderate dehydration."[4]

32.    As these sources reflect, OES products are now a popular, widespread, and trusted source for mild to moderate dehydration.  This is due in large part to Abbott's creation of the OES category with the launch of Pedialyte.

### *Pedialyte's Sustained Leadership in the OES Category*

33.    Accordingly, although Pedialyte was initially the only product of its kind, other OES products have since entered the market to meet the widespread consumer interest in this product category.  Today, the ready-to-drink OES category garners nearly $1 billion in annual retail sales.

34.    Still, Pedialyte remains the best-known brand, commanding roughly 60 percent of dollar sales in the ready-to-drink OES category across the United States. "Private label" ready-to-drink OES products account for roughly 30 percent of dollar sales. All other branded competitors, combined, account for roughly 10 percent.  Thus, no branded competitor commands anything close to the degree of consumer trust and goodwill that the Pedialyte brand has built over 50 years of investment and promotion.

---

[3] *See* https://www.mayoclinic.org/diseases-conditions/dehydration/diagnosis-treatment/drc-20354092. (emphasis added).

[4] *See* https://www.aafp.org/pubs/afp/issues/2009/1001/p692.html.

35.    Pedialyte's leadership in the category reflects the product's penetration of a broad range of households.  In 2021, for example, roughly 5.8% of U.S. households purchased at least one Pedialyte-branded product.  During that same period, only 2.7% of households purchased an OES product other than Pedialyte.  These data points again demonstrate Pedialyte's supremacy and broad recognition within the OES category.

36.    Indeed, Pedialyte is so well-recognized as the category leader that many health resources recommend not only OES products as a category, but the Pedialyte brand itself, for mild to moderate dehydration.

37.    The Centers for Disease Control and Prevention ("CDC"), for example, advises parents to care for dehydrated children by giving them an "[o]ral rehydration solutions (ORS) *such as Pedialyte (Abbott Laboratories)* . . .  or similar commercially available solutions containing appropriate amounts of sodium, potassium and glucose."[5]

38.    Likewise, Verywell Health, an award-winning resource for medical information, recommends "oral rehydration solutions (*e.g., Pedialyte*)" as a treatment "for mild to moderate dehydration" in both children and adults.[6]

39.    This use of the Pedialyte brand name among trusted health resources reflects the recognition and esteem that the Pedialyte trademark has achieved.

---

[5] *See* https://www.cdc.gov/disasters/disease/diarrheaguidelines.html (emphasis added).

[6] *See* https://www.verywellhealth.com/dehydration-symptoms-1298754 (emphasis added).

12

### *The Evolution of the Pedialyte Brand*

40.    As most of these health resources acknowledge, Pedialyte is no longer the only OES product on the market.  But it has retained its place as the most popular, trusted, and widely recognized, thanks to Abbott's continued investment in promoting the product, adapting it to changing consumer needs, and expanding its offerings for a variety of use cases.

41.    Today, the classic ready-to-drink solution is available in Grape, Strawberry, Mixed Fruit, Coconut, and Unflavored variants.  Pedialyte's Advanced Care Plus line of ready-to-drink products—available in Chilled Cherry, Iced Grape, and Berry Frost—adds both prebiotics and 33% more electrolytes than the classic products.

42.    In addition, although the ready-to-drink incarnation remains the flagship product in the Pedialyte line, Abbott has also expanded its offerings to include a powdered format, as well as frozen Pedialyte "ice pops" for individuals who are struggling to keep down liquids.

43.    Some of this innovation reflects Abbott's recognition over the decades that Pedialyte's usefulness extends beyond children with gastrointestinal illness.  In the past 20 years, Abbott has made a concerted effort to educate consumers about the use of Pedialyte for mild to moderate dehydration in any scenario, among persons in any age group.

44.    Today, illness-related dehydration typically accounts for only 40-50% of Pedialyte sales in a given month, though the amount fluctuates in relation to seasonal illness

13

14140600

patterns.  For example, in the summer months, up to 25% can be attributed to excessive heat.

45.    Some consumers also purchase Pedialyte for mild to moderate dehydration resulting from overindulgence in alcohol.  In some months, this use case accounts for an appreciable percentage of Pedialyte sales.

46.    As that particular use case reflects, Abbott has helped consumers to recognize that Pedialyte is not just for children, and can be equally useful to adults suffering from mild to moderate dehydration.  In fact, in a typical month, between one-third and one-half of Pedialyte purchases are made by households with no children.

47.    This diversity of uses is another testament to the strong brand equity and goodwill that Abbott has built in the Pedialyte brand.

### *Abbott's Investment in Promoting and Advertising Pedialyte*

48.    Similarly, although Pedialyte is a long-established brand, Abbott has never taken its consumer base for granted.  On the contrary, it invests prodigious resources in promoting the Pedialyte line, and educating each successive generation of consumers about Pedialyte products' uses and benefits.

49.    As set forth in Part II, *infra*, Abbott has been advertising Pedialyte on network television for decades, and continues to invest heavily in promotional efforts.

50.    In 2022, Abbott invested tens of millions of dollars in marketing Pedialyte directly to consumers.  The direct-to-consumer marketing strategy encompasses not only

14

advertisements in traditional media, but also social media advertisements and engagement, and sponsorships to keep the product top-of-mind.

51.     These investments in promoting Pedialyte are critical, since the product's sales do not depend on a discrete universe of reliable repeat buyers.  Because Pedialyte is a product that is purchased for a specific and acute health need, it draws its sales in large part from consumers who buy the product just once every one or two years, when someone in their household experiences a significant dehydration event.

52.     To attract these occasional buyers, Abbott must ensure that Pedialyte remains top-of-mind among U.S. consumers as a high-quality, trusted brand for rehydration.

## II.    Pedialyte's Unique and Widely Recognized Trade Dress

53.     One way that Abbott has maintained its brand recognition is through its distinctive trade dress, which it features heavily in its advertising.  Even as the Pedialyte brand has evolved and expanded, the packaging and visual presentation of the flagship ready-to-drink product has retained a consistent look and feel.  This trade dress is closely linked to the Pedialyte brand, and is a key component of the brand's sustained visibility and goodwill among consumers.

54.     Since at least as early as 1986, the ready-to-drink product has been sold in its uniquely shaped plastic bottle, with a wrap-around label encircling the middle 50-60 percent of the bottle and identifying the product as Pedialyte.  The bottle reveals the bright colors of the various Pedialyte flavors above and below the wrap-around label.  The wrap-around label itself has a more muted two-tone color palette, and bears the name "Pedialyte"

15

in large letters running parallel to the bottom of the bottle.  The bottle is rectangular with rounded corners and two ridges, or "ribs," which run the circumference of the bottle above and below the wrap-around label.  About a half-inch above the upper ridge, the bottle's rectangular shape gives way to gently sloped "shoulders," which then converge at the product's shrink-wrapped screw-on cap.  The bottle's volume was 32 ounces at the time of its introduction; in 1993, Abbott marginally expanded the bottle to its current volume of 33.8 ounces, or one liter.  Thus, the general appearance, shape, and aesthetic of the bottle have remained constant for several decades.

Present:



16

1993:



55.    The Advanced Care Plus products have their own color palettes to distinguish them from the classic product.  But they too bear these core characteristics, as shown below:



17

56.    The overall look of the product, with these distinct characteristics, has achieved strong secondary meaning and association with the Pedialyte brand.  This is clear from Abbott's investment and promotion of the trade dress; the widespread recognition of the trade dress among consumers; courts' prior recognition of the trade dress's secondary meaning; and the persistent uniqueness of the trade dress in the market, among other things.

### Abbott's Investment in, and Promotion of, the Unique Pedialyte Trade Dress

57.    The essential visual characteristics described above have remained unchanged for decades, and throughout that time have been a central part of the product's presentation to U.S. consumers.  For example, an ABC network commercial from 1996 depicted the Pedialyte product line with exactly these features:  rectangular clear plastic bottle with rounded corners; brightly colored visible liquids; a wrap-around label encompassing the middle 50 percent of the bottle with the Pedialyte brand name parallel to the bottom of the bottle; "ribs" just above and below the wrap-around label; gently sloping shoulders beginning a half-inch or so above the upper ridge and leading to a screw-on cap; and brightly colored liquids visible through the bottle, contrasting with the more muted palette of the branded wrap-around label.[7]

---

[7] *See* https://www.youtube.com/watch?v=lD5Nb-Rurts&t=36s.

18



58.    Another advertisement that ran in approximately 2004 also depicted a close-up of Pedialyte with virtually identical features[8]:



---

[8] *See* https://www.youtube.com/watch?v=3ykxIoSYvS0.

59.     And in 2017, a Pedialyte television commercial, which touted the product's use among adults by depicting a father drinking his daughter's Pedialyte, once again included a close-up shot of the Pedialyte bottle with these signature features[9]:



60.     In more recent incarnations of Pedialyte marketing, the product's unique trade dress has remained front and center.  For example, the vast majority of posts on the @Pedialyte Instagram account feature the product's trade dress.[10]

61.     Thus, for decades, Abbott has not only maintained the product's consistent look and feel, but has also featured that look and feel prominently in its advertising.

---

[9] *See* https://www.facebook.com/pedialyte/videos/busted-rehydrating-with-pedialyte-dont-sweat-it-own-it-its-for-adults-too/963484993751891/.

[10] *See* https://www.instagram.com/pedialyte/?hl=en.

14140600

Through these investments, Abbott has made the product's look and feel a central component of the brand.

### The Pedialyte Trade Dress's Strong Secondary Meaning

62.    These efforts have paid off.  Consumers instantly recognize the Pedialyte trade dress—with its telltale shape, brightly colored liquid, wrap-around label running the circumference of the bottle with more muted colors, and ribs above and below the wrap-around label—as a signifier of the trusted Pedialyte brand.

63.    Abbott's consumer research has shown that more than half of U.S. adult consumers associate the *bottle shape alone* with Pedialyte, even without viewing the wrap-around label or other aspects of the trade dress.  Moreover, the complete Pedialyte trade dress evokes the qualities that consumers most closely associate with the Pedialyte brand, such as "Premium," "Trusted," "Credible," "Recommended," and "Healing."  No competitive product's trade dress evokes these qualities to the same extent.

64.    Consumer sales and consumption patterns in the OES category also reflect the strong recognition that the Pedialyte ready-to-drink trade dress has garnered.  In addition to the ready-to-drink OES product, Abbott, like other OES manufacturers, offers a powdered Pedialyte that consumers can mix with water.  In the OES segment as a whole, such powdered formats have gained popularity, and account for an appreciable minority of sales in the category.  Although the Pedialyte powdered product has likewise gained popularity, the Pedialyte ready-to-drink product enjoys greater consumer recognition, and a greater sales advantage as against competitive products, than the powdered incarnation.

21

This underscores the powerful meaning the trade dress has acquired as a signifier of the Pedialyte brand.

65.     For these reasons, among others, courts have easily concluded that the Pedialyte trade dress has secondary meaning.  When Abbott sued an early infringer of the Pedialyte trade dress several decades ago, the United States District Court for the Southern District of Indiana found that, even then, Pedialyte's trade dress had "an ***extraordinarily high level*** of consumer recognition." *Abbott Labs. v. Mead Johnson & Co.*, IP 91-202C, 1991 U.S. Dist. LEXIS 21010, at *82 (S.D. Ind. Oct. 10, 1991) (emphasis added).  The Seventh Circuit agreed.  *Abbott Laboratories v. Mead Johnson & Co.*, 971 F.2d 6, 21 (7th Cir. 1992).

66.     In a subsequent suit against another infringer, the Southern District of Florida likewise found Pedialyte's trade dress protectable and enjoined the defendant from selling its product in a bottle that "clearly mimic[ked] PEDIALYTE." *See Abbott Laboratories v. Unlimited Beverages, Inc.*, 1993 WL 729626, at *3 (S.D. Fla. Nov. 5, 1993).  Both of these decisions were generated in connection with Abbott's earlier, and successful, efforts to protect its valuable trade dress from infringement.

### *The Pedialyte Trade Dress Remains Unique in the Marketplace*

67.     Thanks in part to these efforts, competitors have largely refrained from copying Pedialyte's trade dress.  As a result, Pedialyte's singular "look and feel" remains unique to, and indelibly associated with, Pedialyte.

22

14140600

68.    Many competitors in the OES category do not sell their ready-to-drink products in rectangular bottles made of transparent plastic.  For example, one ready-to-drink OES, EverLyte, is sold in pouches; another, CF Rehydrate, is sold in opaque bottles. More generally, throughout the category, products vary considerably in container type, size, shape, opacity, labeling color schemes, label and package aesthetics, and product coloring and appearance, among other things.  These variations give each competitive product its own "look and feel" distinct from the Pedialyte trade dress.

69.    Moreover, *all* of Pedialyte's branded competitors offer a different line of flavors than Pedialyte does—another visual point of distinction for consumers.

70.    The continued exclusivity of Abbott's use of Pedialyte's trade dress accounts, to a large extent, for the strong brand recognition that it elicits.

### III.    The Non-Functionality of Pedialyte's Trade Dress

71.    Abbott continues to use Pedialyte's signature trade dress because of the secondary meaning that it has acquired among U.S. consumers, and not for any functional reason.  The product's trade dress does not serve any functional benefit that is necessary for effective competition.  In fact, the trade dress offers no meaningful functional benefits at all.

72.    Many components of the trade dress, such as the color scheme of the wrap-around label, the size and placement of the wrap-around label, and the color of the product, are purely aesthetic.  There is no practical reason for any competitor to emulate these features of the Pedialyte trade dress, and as set forth above, most do not.

23

73.     In addition, the configuration of the Pedialyte bottle is not driven by any functional benefit that is necessary for effective marketplace competition.  As noted above, the OES product category encompasses a wide variety of packtypes.  In ex-U.S. markets, Abbott itself has also used different packtypes for ready-to-drink Pedialyte.  For example, in the Philippines, the prevalent Pedialyte trade dress is markedly different from the trade dress in the United States:



74.     As this variation reflects, there is also no practical benefit to the unique Pedialyte bottle shape.  Sterile goods such as OES products can be efficiently manufactured and sold in virtually any bottle shape, thanks to the capabilities of modern manufacturing methods, such as "hot fill" techniques and aseptic assembly.  Thus, Pedialyte's bottle shape affords no functional benefit whatsoever to competitors entering the OES category.

75.     Accordingly, competitors need not (and typically do not) copy the Pedialyte bottle shape for reasons of manufacturing efficiency.  Though some competitors have

emulated the general use of a rectangular bottle rather than a cylindrical one, even that is unnecessary from a manufacturing-efficiency standpoint.  Nor is there any functional imperative to imitate the ribs or shoulders of the Pedialyte bottle.

76.    As these facts demonstrate, Abbott has not retained this unique look and feel for decade after decade for any practical or functional reason.  Abbott has done so because the trade dress says "Pedialyte" to U.S. consumers.

77.    Revitalyte's co-founder has publicly acknowledged that the value of Pedialyte's trade dress lies solely in this association.  As set forth in Section IV *infra*, the co-founder of Revitalyte admitted that he designed Revitalyte to "look like" Pedialyte so consumers would recognize them—not because there was any practical imperative to do so.  Similarly, as noted supra at ¶ 7, Revitalyte's promotional guide emphasized the importance of displaying the Revitalyte products' trade dress so the company could "*leverage[] its resemblance to Pedialyte*…to close the add-on purchase."  Thus, by Revitalyte's own admission, the value of the trade dress lies in its secondary meaning rather than in any functional benefit.

## IV.    Revitalyte's Unlawful Marketing Strategy and Infringement of Pedialyte's Trade Dress

78.    Revitalyte, a newly emergent competitor in the OES market, is not a health-care or nutrition company.  It has one brand:  its eponymous OES, Revitalyte, which it promotes for use primarily in connection with "curing" hangovers after excessive drinking.

79.    Revitalyte also has one strategy:  use Pedialyte's brand name and trade dress to falsely represent its OES as "the adult *version of Pedialyte*," and an extension of the

world-famous Pedialyte brand.  Rather than distinguishing its product as an ***alternative*** to Pedialyte—based on formula, features, price point, or other metrics important to consumers—Revitalyte has simply aimed to capitalize on the goodwill that Abbott has spent more than a half-century building.

80.    Revitalyte's co-founder, Ryan Leonard, has publicly admitted to this agenda in an interview with *Forbes*.

81.    In the interview, Mr. Leonard described the Revitalyte OES as an "***adult version of Pedialyte***" that consumers can purchase without visiting the baby aisle or enduring "some kind of a joke [ by the cashier] about how you're buying a kid's drink."[11]

82.    The "Pedialyte" part of this brand image is just as critical as the "adult" part to Revitalyte's strategy, if not more so.  Mr. Leonard and his co-founder knew that Pedialyte enjoys tremendous brand recognition and loyalty.  They therefore set out to trade on that loyalty, by wrongly portraying their product as a "version" of Pedialyte.

83.    As the *Forbes* article explains, their approach was simple:  "[they] developed Revitalyte with ***the intent of emulating the look, feel and formulation of Pedialyte***."[12]

84.    This intent informed everything about their brand strategy, starting with their choice of a name.

_____

[11] *See* https://www.forbes.com/sites/chrisfurnari/2020/12/03/canarchy-craft-brewery-collective-inks-deal-with-revitalyte/?sh=5b1ac2af594c (emphasis added).

[12] *See id.* (emphasis added).

14140600

85.    In a sworn declaration supporting Revitalyte's recent summary judgment motion in the *Vitalyte* case, Mr. Leonard admitted that he and his co-founder, Adam Post, "wanted a name ***that rhymed with Pedialyte® to call to mind the well-known use of that product*** to alleviate hangover symptoms."[13]

86.    Next Revitalyte copied every element of the characteristic trade dress that consumers associate with Pedialyte. Revitalyte's OES has identical flavors; identical bottle size and shape; identical coloring of both the product and the wrap-around label; and identical size and configuration of the wrap-around label.

87.    Revitalyte's OES product's original three flavors are Mixed Fruit, Strawberry, and Grape—which, as it happens, are Pedialyte's top three flavors.

 

Mixed Fruit:

---

[13] *See* Exhibit 1 at ¶ 15 (emphasis added).

14140600

Strawberry:





Grape:





88.     Revitalyte purports to have the same formula as Pedialyte as well.   In describing "What is Revitalyte?" in its 2021 Promotional Guide, the first point Revitalyte lists is that their OES products have an "[i]dentical formula to Pedialyte."[14]

---

[14] *See* Exhibit 2 at 2.

89.     For the past several years, Revitalyte has sold its infringing "adult version of Pedialyte" to consumers all over the country from its website, as well as from brick-and-mortar stores.

90.     In 2021, Revitalyte escalated its infringing use of the Pedialyte trademark and trade dress.  That year, Revitalyte partnered with Barstool Sports ("Barstool"), a digital media company, to increase its platform and sales.  In addition, Revitalyte launched its fourth flavor, Berry Frost, which it advertised as "an ***advanced*** version of Revitalyte's original SKU" containing "33% more electrolytes, 10 fewer grams of sugar (per serving), and beneficial prebiotics to promote fast and effective rehydration."[15]

91.     Once again, this was a page straight from the Pedialyte brand playbook.  As described above, Abbott's Pedialyte Advanced Care Plus line also contains 33% more electrolytes, less sugar, and added prebiotics in comparison to the classic Pedialyte product.  Berry Frost is a top-selling flavor of the Pedialyte Advanced Care Plus product.

92.     Once again, for this new flavor, Revitalyte copied virtually every key component of the Pedialyte trade dress, to "emulate the look and feel" of Pedialyte.

---

[15] *See* https://www.brewbound.com/news/barstool-sports-joins-forces-with-revitalyte-in-global-crusade-against-hangovers/ (emphasis added).

14140600

 

Berry Frost:

93.    In the Vitalyte case, Mr. Leonard acknowledged that his products were carbon copies of Pedialyte.

94.    As Mr. Leonard explained, "[l]ike [Revitalyte's] original three REVITALYTE varieties, the Black Label product is a generic version of a Pedialyte® product (here, Pedialyte® Advanced Care Plus) and therefore contain the same ingredients and formulation as th[ose] products."[16]

95.    In addition to emulating Pedialyte's award-winning formula, Mr. Leonard also acknowledged Revitalyte copied Pedialyte's look and feel, instead of developing its own.  What is more, its primary marketing strategy was to elicit consumer recognition by prominently displaying this infringing trade dress.

---

[16] *See* Exhibit 1 at ¶ 29.

14140600

96.     This strategy even dictated Revitalyte's choice of a manufacturer.  On an interview with the podcast "Folly Coffee," Mr. Leonard elaborated on his marketing strategy of copying Pedialyte.

97.     On the podcast, Mr. Leonard explained he and his colleagues maintained a "strict philosophy of not going to market with a product that didn't look like its category."[17] Accordingly, Mr. Leonard decided to use the "one manufacturer out there that makes the white label, like, store brand product that you'd buy at like a CVS or Target, so the, the generic or knockoff of – of – Pedialyte" because it was their "only option to get this product produced so we could look like the category standard."[18]

98.     By the "category standard," Mr. Leonard meant Pedialyte.

99.     As Mr. Leonard went on to explain, this approach was designed to trigger consumers' positive associations with Pedialyte, and mislead them into viewing Revitalyte's product as a "version" of Pedialyte.  In responding to the interviewer's question why he was starting a business that so clearly mimicked Pedialyte, Mr. Leonard acknowledged that this misleading association with Pedialyte was the product's only selling point.

100.    Below is an excerpt from the interview:

> Interviewer:  I think probably the biggest critique of it would be "well your product exists, it's Pedialyte"—

---

[17] *See*: https://www.youtube.com/watch?v=y-ChKz1k2d4 at 33:28–33:35.

[18] *See id.* at 33:36–33:52.

31

Mr. Leonard:  Yeah—

Interviewer:  Why would you start a business if there's something on the market that's really, really similar to what you're doing?

Mr. Leonard:  Yeah, for sure…The couple of key things that I wanted to tackle in launching Revitalyte was, one, I wanted there to be zero communication gap between the brand and the consumer.  So what I mean by that is, like, when it went on to the shelf, I wanted you to see it on the shelf in a liquor store or convenience store or some other store where adults actually shop and see it and go 'oh!,' that's a product that's in that category, ***that's an adult version of the pediatric products, that's got the same qualities to it***, perfect I can buy it here, boom, done.[19]

101.    Mr. Leonard also acknowledged that Revitalyte could have tried to build its own brand equity, but decided that doing so would be too difficult and expensive.

102.    Mr. Leonard explained in the podcast that, in a previous business venture, he learned that instant consumer recognition "was the most important thing" to ensuring a new product's success.  He lamented that "consumers don't immediately understand" new products, and griped that to "***close that gap without having a lot of marketing dollars is damn near impossible***."[20]

103.    Accordingly, Revitalyte decided to trade on Pedialyte's trade dress rather than invest its own "marketing dollars" to build its own brand recognition.

104.    Just as Revitalyte anticipated, this infringing trade dress has proven valuable to "driving sales."

---

[19] *See id.* at 28:41–29:43 (emphasis added).

[20] *See id.* at 29:45–30:15 (emphasis added).

105.    This is apparent from Revitalyte's 2021 Promotional Guide, which emphasizes the necessity of "leverag[ing] . . . resemblance to Pedialyte" to drive consumer sales.[21]



106.    Within the same guide, Revitalyte acknowledges that "Revitalyte Works Best Where Customers Can See It" because "customers can recognize the bottle," there is "[i]nstant product recognition from packaging," and "visibility in the store [] draw[s] immediate recognition," among other reasons.[22]    Revitalyte's 2021 Update likewise includes sales statistics evidencing that "Top Accounts Place Us 'Front and Center' Early On."[23]

107.    As Mr. Leonard acknowledged in his Folly Coffee interview, this critical product recognition driving sales would have been "damn near impossible" without ripping off Pedialyte's signature trade dress.    Simply put, consumers buy Revitalyte's OES only

---

[21] *See* Exhibit 2 at 11.

[22] *See id.* at 7.

[23] *See* Exhibit 3 at 6.

33

because the trade dress misleads them into thinking it is endorsed by, sponsored by, or otherwise affiliated with Pedialyte.

108.    In the Vitalyte litigation, Mr. Leonard asserted under oath that this unlawful strategy had "paid off" for Revitalyte, resulting in "dramatically" increased profits and revenues over the past several years.  Although the data underlying Mr. Leonard's declaration were filed under seal, his statements make clear that Revitalyte has profited amply from its infringing activities, and is continuing to do so on an ever-escalating scale.[24]

109.    Taking all of this together, there is no room for doubt that Revitalyte's OES products' trade dress are a "knockoff of Pedialyte."  The express goal of Revitalyte was for its OES to emulate the "look and feel"—*i.e.*, the protected trade dress—of Pedialyte, the longtime category leader.  That way, consumers would view Revitalyte's OES not as the unknown, untested product that it is, but rather as a "version" of Pedialyte with the "same qualities" as that trusted brand.  This strategy is working out just as Revitalyte planned: every day, consumers are buying Revitalyte's OES based on their mistaken understanding that it is a "version of" Pedialyte.

V.    **Revitalyte's Use of Pedialyte's Trademark to Promote and Sell Its Own Product**

110.    Copying the Pedialyte trade dress is just one plank of Revitalyte's strategy.  Another is to invoke the Pedialyte brand name explicitly.  Revitalyte uses the Pedialyte

---

[24] *See* Exhibit 1 at ¶ 36.

34

trademark to promote its own product in advertising, on social media, and even on its product packaging.

### *Revitalyte's Introduction of Its OES Product as "The Adult Version of Pedialyte"*

111.   As noted above, Revitalyte co-founder Mr. Leonard has publicly described the Revitalyte OES as an "adult version" of Pedialyte that offers the "same qualities" but is available for sale outside the baby aisle of grocery or drug stores.

112.   In an earlier version of its website, Revitalyte flagrantly traded on the Pedialyte brand name, appealing directly to consumers who wanted to purchase Pedialyte without going to the baby aisle of a food or drug store.   Revitalyte's homepage, www.drinkrevitalyte.com, prominently featured a collection of tweets about consumers' purported "embarrassment" at having to go to the baby aisle to purchase Pedialyte.   Each one of these tweets relayed supposedly humorous stories about buying Pedialyte while suffering the after-effects of excessive drinking:

14140600

## Did we mention we've all been there?



113.    Nowhere on this page did Revitalyte clarify the lack of connection between its OES product and Pedialyte.  Nor did it suggest its product as an adult ***alternative*** to Pedialyte that offered superiority on some metric.  Instead, it empathized with these consumers' plight ("we've all been there") and urged Pedialyte-loving consumers to "Find Revitalyte"—suggesting that Revitalyte's OES *was* Pedialyte, now available through purportedly different and "less embarrassing" channels.

114.    Although this content has now been removed from Revitalyte's website, the site still presents the Revitalyte OES as the choice for consumers who want to obtain "America's favorite hangover helper" without going to the baby aisle.

115.    While not as flagrant as the initial version of the website, this, too, underscores Revitalyte's attempt to trade on consumers' brand loyalty to Pedialyte, rather than differentiating its product from Pedialyte.  Most manufacturers do not describe their competitors' products as "America's favorite."  Revitalyte does so only in an attempt to depict its product as a "version of" Pedialyte, as opposed to a competitive alternative.

116.    This "version of Pedialyte" branding is so pervasive that some regulatory authorities have picked up on it.  In a decision barring Revitalyte's OES from sale in Indiana liquor stores, the Indiana Alcohol and Tobacco Commission concluded that Revitalyte was "***specifically marketed as an 'adult' version of the rehydration product Pedialyte***, commonly stocked in a store's infant aisle."[25]

117.    Revitalyte is continuing to engage in this infringing activity on an ever-expanding scale.  Shortly after Revitalyte partnered with Barstool to expand its marketing, Abbott learned that the company had secured distribution of its OES at convenience store chains, displacing Pedialyte in at least one chain.  In October 2022, Revitalyte peddled its infringing OES at an elite convenience-store trade show, leading *Beverage Digest* to describe Revitalyte as a "highlight" of the show.[26]

118.    Recent developments in the *Vitalyte* litigation have also brought the extent and willfulness of Revitalyte's infringement into view.  In that case, which arose from

---

[25] *See* https://www.in.gov/atc/files/Advisory-Opinion_22-01.pdf at 3 (emphasis added).

[26] *See* https://www.beverage-digest.com/articles/757-highlights-from-nacs-show-for-convenience-retailers?v=preview.

Revitalyte's alleged infringement of a different trademark, Revitalyte moved for summary judgment.  The court heard argument on January 18, 2023 and denied Revitalyte's motion on February 13, 2023.  The Leonard declaration, the August 2021 "Revitalyte Update," and the 2021 "Promotional Guide," which reflected Revitalyte's deliberately coordinated campaign to infringe the Pedialyte trademark and trade dress, were filed on the docket in connection with Revitalyte's unsuccessful summary judgment motion in *Vitalyte*.

### *Revitalyte's Embrace of Consumers' Confusion About the Product's Source*

119.   Revitalyte's increasingly aggressive infringement creates a grave risk of consumer confusion.  Indeed, consumers have already been misled into believing that Revitalyte's product is indeed the "adult version" of Pedialyte, or "Pedialyte by Barstool Sports."  Instead of dispelling these instances of confusion, Revitalyte has endorsed them.

120.   Revitalyte's social media feeds are replete with examples.  Here are several, in which Revitalyte has re-tweeted descriptions of Revitalyte OES as the "the adult version of Pedialyte":

38





Revitalyte Retweeted

**Moreno's Liquors** @MorenosLiquors · Jul 16, 2021

Just in case you overindulge this weekend we have something to help you recuperate. Revitalyte electrolyte is the adult version of Pedialyte. 🍹🫐🕶
Available in three flavors, Grape, Berry Frost, and Mixed Fruit.
#weekend #Friday #lavillita #littlevillage #thewindicity

2 4

**Revitalyte** @DrinkRevitalyte · Jun 20, 2019

Go grab some Revitalyte at @liquorlodge16!

**Liquor Lodge Inc** @liquorlodge16 · Jun 15, 2019

Suffering from a hangover today?!?! Try Revitalyte! It's like Pedialyte but for adults. Now sold at the Liquor Lodge.

2

14140600

121.   Similarly, after partnering with Barstool in 2021, Revitalyte began to endorse tweets and other social media posts stating that Revitalyte's OES was the "***Barstool version***" of Pedialyte.







Revitalyte Retweeted

**banana** @lambertweets · Aug 14, 2021

Barstool pedialyte is a horseman of the apocalypse

2 8 38

Show this thread

Revitalyte Retweeted

**Ellie Black** @efblack36 · Sep 3, 2022

my loved ones are running around the city in a panic because i have covid but refuse to drink any liquids besides the barstool sports brand pedialyte and if they don't find it for me soon i could die

1 1 7

Revitalyte Retweeted

**Alex Bean** @ABeanTweeting · Oct 31, 2021

Replying to @ctoner

There's Barstool-branded Pedialyte in my corner store. I give it a dirty look every time.

1 1 2

Revitalyte Retweeted

**me** @boltsfood · Jan 1

drinking barstool sports branded pedialyte and watching a video of a armenian man making egg salad

1 2 15 1,770

14140600

122.    In none of these retweets does Revitalyte own up to the fact that it is a new and unknown brand, with no connection to Pedialyte.  On the contrary, by retweeting these statements, Revitalyte reinforces the notion of such a connection.

123.    In a particularly egregious example, Revitalyte even retweeted a consumer's tweet calling the Revitalyte product **"#revitalyte by @pedialyte**."  Once again, Revitalyte adopted this characterization with no clarification at all that Revitalyte is not affiliated with, or sponsored by, Pedialyte.



124.    By heavily peppering its website and social media feed with approving references to "Pedialyte," Revitalyte has deliberately reinforced the false impression that its OES is a *version* of Pedialyte, rather than a competitor.  This way, it can use Pedialyte's world-famous trademark and trade dress to sell its OES product without having to spend decades establishing its brand equity, as Abbott did.

### *Revitalyte's Confusing "Compare to Pedialyte" Language on the OES Bottle Cap*

125.    Revitalyte's use of the Pedialyte mark even extends to its product packaging. There, Revitalyte repeatedly stamps the words "Compare to Pedialyte" all over the shrink wrap surrounding the cap of the Revitalyte OES.  In fact, Abbott's Pedialyte trademark appears on the Revitalyte package *more often* than Defendant's Revitalyte trademark.

42

126.    "Compare to" language of this sort is commonplace on the packaging of "private label" brands—also known as "store brands"—to enable consumers to identify the comparable branded product.  But Revitalyte's OES is not a private label product, so its "Compare to Pedialyte" language does not identify it as such.

127.    Unlike the typical private label product, Revitalyte's OES offers consumers no cost savings whatsoever.  As stated in Revitalyte's August 2021 "Revitalyte Update," their OES products' "[s]uggested retail price is in-line with the category at ~$2.99-$3.50 per 16.9oz serving."[27]  On Revitalyte's website, the three original flavors— Strawberry, Grape, and Mixed Fruit—are sold in six packs for $35.99, for an average of $6.00 per bottle, or $2.99 per 16.9oz serving.  The Black Label by Barstool retails on the site for $41.99, for an average of $7.00 per bottle, or $3.50 per 16.9oz serving.  Similarly, Pedialyte Classic and Advanced Care Plus products are sold for $5.44 and $5.96 per bottle, or $2.72 and $2.98 per 16.9oz serving, on www.walmart.com.  By contrast, private label OES products often retail for 40-50 percent less than Pedialyte in the same retail outlet.

128.    It is practically unheard-of for a nationally branded competitive product, such as Revitalyte, to feature a "Compare to" statement of this nature.  In fact, the statement is so closely associated with private label brands that Nielsen, a premier market intelligence aggregator, *defines* a "private label" OES product as an OES product whose labeling says "Compare to Pedialyte."

---

[27] *See* Exhibit 3 at 5.

129.    Revitalyte's highly unusual adoption of this language provides Revitalyte with yet another means of capitalizing and trading on the Pedialyte mark.

130.    In furtherance of this strategy, Revitalyte runs ads prominently featuring Pedialyte's name on the "Compare to" seal while obscuring its own.

131.    For example, in late 2021 and early 2022, Revitalyte disseminated an ad that was a parody of an ad for Netflix film *Don't Look Up* starring Jennifer Lawrence and Leonardo DiCaprio, shown below:



132.    Revitalyte took this image, edited the text from "Don't Look Up" into "Don't **Throw** Up," and added a bottle of Revitalyte OES into Leonardo DiCaprio's hands.  But instead of featuring its own brand name in the ad, as one might expect, Revitalyte highlighted the name of its ostensible competitor.  In the ad, Revitalyte blocked out every

44

portion of the bottle containing the word "Revitalyte"— leaving "***Pedialyte***" as the only visible brand name in the ad.



133.    In fact, the only components of the product visible in the ad were Pedialyte's trademark (on the bottle cap) and Pedialyte's trade dress. One would never fathom that the company disseminating this ad was a purported ***competitor*** of Pedialyte.

134.    Thus, the "Compare to Pedialyte" language is another way in which Revitalyte infringes and improperly trades on the Pedialyte trademark.

## VI.    The Likelihood of Consumer Confusion

135.    As set forth above, and as acknowledged by Revitalyte, consumers use Pedialyte on a wide variety of occasions, including for mild to moderate dehydration

45

caused by alcohol consumption.  In addition, the products are relatively low-cost consumer goods, retailing for less than $10 per unit.

136.   The products are also targeted at the general population, as opposed to individuals with special training or expertise.

137.   All of these factors increase the risk that Revitalyte's trademark and trade dress infringement will have their intended effect:  confusing consumers into thinking there is an association between Revitalyte's OES product and Pedialyte.  As discussed above, Mr. Leonard deliberately copied Pedialyte's trade dress so that Revitalyte's OES products would be recognizable and familiar to consumers.  The 2021 Revitalyte marketing decks highlighted this strategy's importance to "driving" sales of the product.

138.   Indeed, there is ample evidence from Revitalyte's social media feeds that consumers are confused about the relationship between Revitalyte's OES and Pedialyte.  In addition to the examples noted above, several consumers have explicitly questioned Revitalyte about its product's connection to Pedialyte, or otherwise expressed confusion about that subject.  Unsurprisingly, Revitalyte has not given those consumers straight answers or bothered to clarify any confusion.

139.   For example, on various Revitalyte Instagram posts, users have recognized Revitalyte's trade dress as a replica of Pedialyte's famous trade dress.  "William__healy" commented "I mean bruh it's literally the same bottle" and "Imagine repackaging Pedialyte and then selling it."  On a separate post, Instagram users "notmikedurkin" and "adampwrs" both asked "*is that pedialyte*?"  User "will.dunham" commented on a third post "Sheeeeesh

46

*slapped a new label on the pedialyte* everyone's been drinking for years." In each instance, Revitalyte failed to respond to the users' comments.

140.    These consumer comments underscore both the secondary meaning associated with Pedialyte's trade dress, and the confusion that is likely to result from Revitalyte's infringement.





DRINKREVITALYTE
**Posts**                                    Follow

drinkrevitalyte                                ...

**1,162 likes**
drinkrevitalyte Who's dorm room is this? @barstoolu
@pinkwhitney
View all 36 comments
scusi.dj @rmac_scott
notmikedurkin Is that pedialyte?
July 29, 2021

**Comments**

drinkrevitalyte 80w
Who's dorm room is this? @barstoolu
@pinkwhitney

adampwrs 76w
Is that peedeeyalight?
Reply

14140600



141.   Other commenters on Revitalyte's Instagram feed have similarly expressed the incorrect understanding that Revitalyte's OES and Pedialyte are from the same manufacturer.  One user complimented Revitalyte on effectuating a brand "pivot" from Pedialyte's traditional consumer base to target "adults with substance abuse problems."  Of course, it is not a brand "pivot" at all; it is an entirely different and unrelated brand.

142.   Yet Revitalyte declined to dispel the Instagram user's confusion.  On the contrary, Revitalyte coyly responded that it was "just raising the Stakes"—implying that Revitalyte's OES *did* in fact represent a brand "pivot" for Pedialyte, rather than a totally unrelated product.



143.    Revitalyte often resorts to this brand of "humor" when confronted with point-blank questions about its relationship to Pedialyte.  In another example, an Instagram user named "brendanchatt" asked on a Revitalyte post "Did you just make a deal with Pedialyte to white label their drink?"  Instead of answering this simple question with a simple "no," Revitalyte insulted the user's appearance by responding "did you make a deal to white label Count Chocula's facial hair?"



144.    Revitalyte intentionally avoids answering these questions because it *wants* consumers to believe, incorrectly, that its OES and Pedialyte are affiliated.  Having recently entered the market and lacking any brand equity or the budget to build one of its own, Revitalyte's entire marketing strategy is premised on creating that false impression.

145.    At least one consumer has also become confused by the "Compare to Pedialyte" language on the Revitalyte product's cap, and accordingly encouraged Revitalyte to reconsider that aspect of its packaging.  An Instagram user identified as "the_legend_of_taozan" commented on a Revitalyte post "Is this a product from Pedialyte?"  Revitalyte replied: "We are Revitalyte!  Directly comparable product available in liquor and convenience stores!"  The user commented back "*I would remove the compare to Pedialyte seal from the cap*" because "*people might think it's a Pedialyte*

*product*" and "[y]ou don't want that confusion."  Of course, Revitalyte *did* want that

confusion, and still does.



146.    These instances of consumer confusion confirm the strong likelihood that

Revitalyte's deliberate infringement is currently causing, and will continue to cause,

confusion about a potential link between Revitalyte and Pedialyte.  They also demonstrate

the strength of the Pedialyte trade dress and trademark.

## VII.    Revitalyte's Trading on Pedialyte's Name and Dress Tarnishes the Pedialyte Brand

147.    In addition to trading on Pedialyte's name and dress, Revitalyte has also

tarnished the Pedialyte brand by promoting its "adult version of Pedialyte" in a manner that

is inconsistent with Abbott's image as a trusted health-care brand.  This has diluted the

value of Abbott's trademark and trade dress.

52

148.    As set forth above, Pedialyte enjoys a strong reputation as a high-quality health care product.  A range of trusted health sources, from the CDC to Verywell Health, recommend Pedialyte for mild to moderate dehydration.  Consumers perceive Pedialyte as "credible," "trusted," and "healing."

149.    By contrast, Revitalyte's marketing of its OES — the so-called "adult version of Pedialyte" —  centers upon the endorsement of heavy drinking among young adults.  Revitalyte promotes its OES for relief of hangover symptoms, but it does not stop there.  Instead, it encourages young adults to embrace excessive drinking, on the theory that Revitalyte's OES will avert the ill effects of that behavior.  Indeed, that appears to be a main facet of its marketing strategy, second only to trading on the goodwill of the Pedialyte brand by infringing Pedialyte's trademark and trade dress.

150.    For example, one post on the Revitalyte Instagram account depicts a consumer who is described as "15 Vodka Tonny's Deep at 2:30AM" but is laughing gleefully at a notification on his phone that shows "Your Revitalyte order has shipped."  In other words, the advertisement implies, consumers can feel confident drinking *15 vodka tonics* because Revitalyte's OES can cure the ensuing hangover.



**drinkrevitalyte** All friend groups are built the same...
#hydrateresponsibly

151.    A similar ad on Revitalyte's Instagram account includes a photo of a man purportedly "waking up after 15 beers, 10 cigarettes, and snoring for 11 hours straight…" In the caption, Revitalyte offers its solution to the man's discomfort:  "Revitalyte is your nightstand's new best friend."

54



152.    The suggestion that Revitalyte's OES empowers individuals to consume *15* alcoholic beverages in a single evening, without ill effects, is preposterous and irresponsible.  A 130-pound woman who consumed that amount over a six-hour period would have a blood alcohol content of *0.6*—easily high enough to trigger fatal alcohol poisoning.  Yet Revitalyte's marketing normalizes and even glorifies this dangerous level of binge drinking, suggesting that all you need to get away with it is to drink a Revitalyte.

153.    At the same time, Revitalyte's social media accounts are replete with promotions directed at college students, and tie-ins to collegiate sporting events.  In fact, Revitalyte's 2021 Promotional Guide lists "College Partiers" first among Revitalyte's

target demographics.[28]  Thus, Revitalyte not only celebrates binge drinking, but does so among college students—many of whom are underage, and few of whom are likely to have well-developed judgment with regard to alcohol consumption.

154.   Revitalyte also portrays excessive drinking not as an occasional occurrence, but as a pattern that consumers should aspire to repeat.  Revitalyte's primary slogan, featured on its Twitter homepage, is  "Rehydrate. Recover. Repeat."

155.   This irresponsible marketing has already led at least one state, Indiana, to ban Revitalyte's OES from being sold in its liquor stores.  The Indiana Alcohol and Tobacco Commission concluded that Revitalyte's marketing, including the "Rehydrate. Recover. Repeat" slogan, improperly "encourage[d] citizens to overconsume alcohol, against the express purpose of Indiana law."[29]  Accordingly, the Commission concluded that the product should not be sold in liquor stores, where it could give the false impression of being a prophylactic against the serious health and safety consequences of binge drinking.

156.  Revitalyte's 2021 partnership with Barstool is another example of Revitalyte's focus on marketing its products in connection with excessive drinking. Barstool is generally known for sponsoring questionable campaigns, including a concert tour titled "Barstool Blackout" targeted at college students, whose shows were cancelled by various venues after incidents of underage drinking, hospitalizations, and arrests related

---

[28] *See* Exhibit 2 at 5.

[29] *See* https://www.in.gov/atc/files/Advisory-Opinion_22-01.pdf at 3.

to alcohol.[30]  Forbes described Barstool as being "known for its sophomoric brand of humor and fetishization of drinking culture" and Mr. Leonard stated their partnership established "a direct line to our core market that we generally speak to."[31]

157.    Consistent with this image, Barstool has, indeed, enthusiastically embraced the promotion of Revitalyte as a brand that encourages and facilitates recurrent binge drinking.  For example, Barstool tweeted Revitalyte's mantra "Beers. Rehydrate. Repeat." above a picture of a bottle of Revitalyte's OES, alongside text implying that the consumption of Revitalyte's OES recharges the drinker to repeat a night of excessive drinking.  Revitalyte retweeted the message.



---

[30] *See* https://abcnews.go.com/US/blackout-parties-bring-alcohol-poisoning-unruly-crowds-college/story?id=16041033; https://vtcynic.com/news/blackout-party-banned/; https://www.fogelmanlawfirm.com/barstool-blackout-parties-leav/.

[31] *See* https://www.forbes.com/sites/chrisfurnari/2020/12/03/canarchy-craft-brewery-collective-inks-deal-with-revitalyte/?sh=5b1ac2af594c.

158.    Barstool has also infused these ads with additional vulgarity and crassness. In one Tweet featuring a tournament-style bracket of "Best Hangover Moves," Barstool included Revitalyte as an option next to "Puking," "Shitting," and "Keep Drinking," among others.



159.    Another such post depicts "the universe" giving a young gentleman the middle finger after a night of drinking.  Still another depicts two gentlemen fighting over Revitalyte, while one holds a bottle (*i.e.*, ***Pedialyte's trade dress***) in front of his pelvic area as though it were a phallus.  Not only does the latter post feature Revitalyte's unlawfully infringing trade dress, but it further sows confusion with the caption "Showdown in the baby aisle"—where ***Pedialyte***, not Revitalyte's OES, is found.



14140600

160.    Abbott considers these marketing tactics to be irresponsible and in poor taste. Nevertheless, Abbott is not a regulator, and does not presume to tell any competitor in the OES space how to market its own product.  If Revitalyte wishes to promote a competitive OES product by encouraging 19-year-olds to consume 15 drinks in a single evening, that is its prerogative.

161.    However, Revitalyte has not merely promoted a "competitive product" in that manner.  Rather, it has used these crass and irresponsible tactics to promote the so-called "***adult version of Pedialyte***" or "***Barstool Pedialyte***"—all while making ample use of the world-famous Pedialyte trademark and trade dress.  In this way, it has not only traded on the Pedialyte brand, but has also linked that brand to the encouragement of dangerous binge drinking.   That encouragement is sharply at odds with Pedialyte's brand image as a "trusted," "healing," and venerable health-care product.

162.    By the terms of its own marketing materials, Revitalyte targets a consumer base that is familiar with Pedialyte and would otherwise choose Pedialyte.  Accordingly, these tarnishing images are likely to reach Pedialyte's consumers and affect their perception of the Pedialyte brand.  As discussed in Section VI, *supra*, there is evidence that this tarnishment is already occurring:  for example, one Instagram user complimented Revitalyte on "pivot[ing]" from Pedialyte's image as a health-care product to targeting "adults with substance abuse problems."  The more consumers wrongly associate Pedialyte with this "pivot," the less likely they are to view it as a "trusted" and "healing" brand.

60

163.    In this manner, Revitalyte is tarnishing and diluting the world-famous Pedialyte trademark.  Because of the trust that trademark inspires, consumers have long felt comfortable choosing Pedialyte for mild to moderate dehydration among children and adults.  By associating the Pedialyte mark with crass encouragement of "repeat" binge drinking, Revitalyte is eroding that hard-earned trust.

164.    Pedialyte's reputation, dress, and mark have been and will continue to be irreparably damaged by Revitalyte's crass marketing so long as Revitalyte continues to simultaneously trade on and use Pedialyte's name and dress in its product and marketing.

## COUNT I

### FEDERAL TRADE DRESS INFRINGEMENT (LANHAM ACT)

165.    Abbott incorporates and alleges Paragraphs 1 to 163 above, as if fully restated herein.

166.    As alleged herein, Abbott has sold Pedialyte with its distinctive bottle shape and aesthetic for decades, and has promoted this look and feel extensively.  As a result, a large segment of the OES-consuming public identifies Pedialyte's distinctive and non-functional bottle shape, labeling, and product coloring as belonging to a particular brand.  Pedialyte's trade dress has accordingly acquired secondary meaning.

167.    Pedialyte's trade dress serves no meaningful functional purpose, and is valuable solely because of its secondary meaning.

14140600

168.    Revitalyte adopted and began to use trade dress substantially and confusingly similar to Pedialyte's trade dress as part of a deliberate and willful effort to benefit from Pedialyte's goodwill.

169.    Revitalyte's unauthorized and infringing OES products are targeted and marketed for the same purposes as Abbott's Pedialyte products, among many of the same consumers.

170.    Revitalyte's use of a trade dress that imitates or simulates the trade dress of Pedialyte as set forth above is likely to cause confusion among members of the public and to cause them to mistakenly believe that Revitalyte's products originate with or are produced, distributed, displayed, or sold in affiliation with, under license from, or with sponsorship, endorsement or other approval of Abbott.

171.    Revitalyte's intentional use of confusingly similar trade dress is likely to and does allow Revitalyte to misappropriate and unfairly trade upon the valuable goodwill and reputation of Pedialyte.

172.    Revitalyte has infringed and will continue to infringe the rights of Abbott in its trade dress in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). Mainly, Revitalyte's acts constitute false designation of origin, false and misleading descriptions, and false and misleading representations, which are likely to cause confusion, mistake, or deception as to the affiliation, connection, or association of Revitalyte's products with Pedialyte, or as to the origin, sponsorship, or approval of Revitalyte's products by Abbott.

## COUNT II

**FEDERAL TRADEMARK INFRINGEMENT (LANHAM ACT)**

173.    Abbott incorporates and alleges Paragraphs 1 to 171 above, as if fully restated herein.

174.    Revitalyte's unauthorized use of Abbott's world-famous Pedialyte mark as alleged herein is likely to deceive consumers as to the origin, source, sponsorship, or affiliation of Revitalyte's products.  And it is likely to cause consumers to believe, contrary to fact, that Revitalyte's products are sold, authorized, endorsed, or sponsored by Abbott, or that Revitalyte is in some way affiliated with or sponsored by Abbott.  Revitalyte's conduct therefore constitutes trademark infringement in violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114.

175.    Revitalyte committed the foregoing acts of infringement with full knowledge of Abbott's prior rights in the Pedialyte trademark and with the willful intent to cause confusion and trade on Pedialyte's goodwill.

176.    Revitalyte's conduct is causing immediate and irreparable harm and injury to Abbott, and to Pedialyte's goodwill and reputation, and will continue to both damage Pedialyte's mark and confuse the public unless enjoined by this Court.  Abbott has no adequate remedy at law.

177.    Abbott is entitled to, amongst other relief, injunctive relief to prohibit the future manufacture, distribution, marketing, sale or shipment of the infringing Revitalyte products, and an award of Defendant's profits and reasonable attorneys' fees and costs of

the action under Sections 34 and 35 of the Lanham Act, 15 U.S.C. §§ 1116, 1117, together with prejudgment and post-judgment interest.

## COUNT III

### FEDERAL UNFAIR COMPETITION, FALSE DESIGNATION OF ORIGIN, AND FALSE ADVERTISING (LANHAM ACT)

178.    Abbott incorporates and alleges Paragraphs 1 to 177 above, as if fully restated herein.

179.    Revitalyte's unauthorized use in commerce of Abbott's Pedialyte trademark and dress as alleged herein is likely to deceive consumers as to the origin, source, sponsorship, or affiliation of Revitalyte's products.  And it is likely to cause consumers to believe, contrary to fact, that Revitalyte's products are sold, authorized, endorsed, or sponsored by Abbott, or that Revitalyte is in some way affiliated with or sponsored by Abbott.

180.    Revitalyte's unauthorized use in commerce of Abbott's Pedialyte trademark and dress as alleged herein constitutes use of a false designation of origin and misleading description and representation of fact.

181.    Upon information and belief, Revitalyte's conduct as alleged herein is willful and is intended to and is likely to cause confusion, mistake, or deception as to the affiliation, connection, or association of Revitalyte with Abbott's Pedialyte products.

182.    Revitalyte's conduct as alleged herein constitutes unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

183.   Revitalyte's conduct as alleged herein is causing immediate and irreparable harm and injury to Abbott, and to Pedialyte's goodwill and reputation, and will continue to both damage Abbott and confuse the public unless enjoined by this court.  Abbott has no adequate remedy at law.

184.   Abbott is entitled to, among other relief, injunctive relief, disgorgement of Defendant's profits, and reasonable attorneys' fees and costs of the action under Sections 34 and 35 of the Lanham Act, 15 U.S.C. §§ 1116, 1117, together with prejudgment and post-judgment interest.

## COUNT IV

### FEDERAL TRADEMARK AND TRADE DRESS DILUTION BY TARNISHMENT (LANHAM ACT)

185.   Abbott incorporates and alleges Paragraphs 1 to 183 above, as if fully restated herein.

186.   As alleged herein, the "Pedialyte" mark and Pedialyte trade dress became famous and acquired secondary meaning long prior to Revitalyte's use of the Pedialyte mark and dress.

187.   Revitalyte's willful unauthorized use in commerce of Pedialyte's famous and distinctive trademark and dress, and in connection with its binge-drinking focused marketing, has harmed the reputation of Pedialyte's mark and dress.

188.   Revitalyte's conduct as alleged herein constitutes dilution by tarnishment in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(c).

189.    Revitalyte's conduct as alleged herein is causing immediate and irreparable harm and injury to Abbott, and to Pedialyte's goodwill and reputation, and will continue to damage Abbott unless enjoined by this court.  Abbott has no adequate remedy at law.

190.    Abbott is entitled to, among other relief, injunctive relief and an award of Defendant's profits and reasonable attorneys' fees and costs of the action under Sections 34 and 35 of the Lanham Act, 15 U.S.C. §§ 1116, 1117, together with prejudgment and post-judgment interest.

## COUNT V

## VIOLATIONS OF THE MINNESOTA DECEPTIVE TRADE PRACTICES ACT

191.    Abbott incorporates and alleges Paragraphs 1 to 189 above, as if fully restated herein.

192.    Revitalyte has engaged in the transaction of business and the commission of tortious acts in this jurisdiction and are subject to the Court's jurisdiction.

193.    Revitalyte's unauthorized use of Pedialyte's registered trademark as alleged herein is likely to deceive consumers as to the origin, source, sponsorship, or affiliation of Revitalyte's products.  And it is likely to cause consumers to believe, contrary to fact, that Revitalyte's products are sold, authorized, endorsed, or sponsored by Abbott, or that Revitalyte is in some way affiliated with or sponsored by Abbott.  Revitalyte's conduct therefore constitutes trademark and trade dress infringement in violation of the Minnesota Deceptive Trade Practices Act, including Minnesota Statute § 325D.44.

14140600

194.   Moreover, Defendant intentionally adopted and used trade dress substantially similar to Abbott's Pedialyte Classic and Advanced Care Plus products. Revitalyte's use of a trade dress that imitates or simulates the trade dress of Pedialyte as set forth above is likely to cause confusion among members of the public and to cause them to mistakenly believe that Revitalyte's products originate with or are produced, distributed, displayed, an extension of, or sold in affiliation with, under license from, or with sponsorship, endorsement or other approval of Abbott.

195.   Revitalyte's use of Pedialyte's trademark and confusingly similar trade dress is likely to and does allow Revitalyte to unfairly trade upon, and profit from, the valuable goodwill and reputation of Pedialyte.

196.   Upon information and belief, Revitalyte committed the foregoing acts of infringement and with full knowledge of Abbott's prior rights in the Pedialyte trademark and dress and with the willful intent to cause confusion and trade on Pedialyte's goodwill.

197.   Revitalyte's conduct is causing immediate and irreparable harm and injury to Abbott, and to Pedialyte's goodwill and reputation, and will continue to both tarnish Pedialyte's mark and confuse the public unless enjoined by this Court. Abbott has no adequate remedy at law.

198.   Abbott is entitled to, amongst other relief, injunctive relief to prohibit the future manufacture, distribution, marketing, sale or shipment of the infringing Revitalyte products, disgorgement of Revitalyte's ill-gotten profits, an award of reasonable attorneys'

14140600

fees, and costs of the action under Minnesota Deceptive Trade Practices Act, including Minnesota Statutes § 325D.45, together with prejudgment and post-judgment interest.

## PRAYER FOR RELIEF

WHEREFORE, Abbott demands judgment against Revitalyte as follows:

1.    That the Court enter judgment in favor of Abbott and against Revitalyte on all claims for relief alleged herein;

2.    That the Court issue a permanent injunction:

    a.    enjoining Revitalyte, its employees, owners, agents, officers, directors, attorneys, representatives, affiliates, subsidiaries, successors, assigns, and all those in active concert or participation with them or having knowledge of the claims alleged herein from using Pedialyte's distinctive trade dress, alone or in combination with any other word(s), term(s), designation(s), mark(s), or design(s), as well as any similar trade dresses or making false or misleading statements or omissions that Revitalyte is sold, authorized, endorsed, or sponsored by Abbott as a Pedialyte product;

    b.    requiring Revitalyte to deliver up for destruction all literature, signs, billboards, labels, prints, packages, wrappers, containers, advertising materials, stationery, and other items in their possession, custody or control that infringe Pedialyte's trademark or trade dress, and to delete all mentions of "Pedialyte" from its website and social media accounts

68

(other than disclaimers of a connection to Pedialyte as described below), pursuant to 15 U.S.C. § 1118;

c.    enjoining Revitalyte, whether directly or by implication, in any advertisement or promotional communication, that

i.    Revitalyte is sold, authorized, endorsed, or sponsored by Abbott as a Pedialyte product, including but not limited to the materials described herein;

3.    That the Court enter an Order directing Revitalyte to disseminate, in a form to be approved by the Court, advertising designed to correct the erroneous impressions created by the false and misleading claims made by Revitalyte in its advertising, and to clarify that its product is not affiliated in any way with Abbott or Pedialyte, by doing, among other things, the following;

a.    Prominently displaying a disclaimer on its website's homepage, www.drinkrevitalyte.com, for a period of six months, that Revitalyte's products are not associated with Pedialyte in any form and are not originated with or produced, distributed, displayed, or sold in affiliation with, under license from, or with sponsorship, endorsement or other approval of Abbott;

b.    Distributing to retailers, along with its standard "shelf cards" or other merchandising materials, a sign prominently containing the same disclaimer, to be displayed for not less than six months;

69

14140600

4.     That the Court enter an Order pursuant to 15 U.S.C. § 1116(a) directing Revitalyte to file with the Court and serve upon Abbott, within 30 days after entry of judgment, a report, in writing and under oath, setting forth in detail the manner and form in which Revitalyte has complied with the judgment;

5.     That the Court award Abbott the entirety of Defendant's profits from its willful infringement since its inception and reasonable attorneys' fees and costs, together with prejudgment and post-judgment interest;

6.     That the Court award Abbott such other and further relief as it may deem just and proper.

Dated:  May 19, 2023              */s/ Joseph W. Winkels*
                                     Joseph W. Winkels (#349707)
                                     CARLSON, CASPERS, VANDENBURGH & LINDQUIST, P.A.
225 South Sixth Street, Suite 4200
Minneapolis, MN 55402
Telephone (612) 436-9600
Facsimile (612) 436 9605
JWinkels@carlsoncaspers.com

PATTERSON BELKNAP WEBB & TYLER LLP
William F. Cavanaugh, Jr. (*pro hac vice* to be filed)
Jane Metcalf (*pro hac vice* to be filed)
1133 Avenue of the Americas
New York, New York 10036
Telephone (212) 336-2110
Facsimile (212) 336-2111
wfcavanaugh@pbwt.com
jmetcalf@pbwt.com

14140600