# Exhibit 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SAN DIEGO DIVISION

| | |
|---|---|
| VITALYTE SPORTS NUTRITION, INC.,<br><br>Plaintiff,<br><br>v.<br><br>REVITALYTE LLC, and DOES 1-10, inclusive,<br><br>Defendants.<br><br>REVITALYTE LLC,<br><br>Counterclaimant,<br><br>v.<br><br>VITALYTE SPORTS NUTRITION, INC.,<br><br>Counterdefendant. | Case No. 3:21-cv-00880-JO-BGS<br><br>**DECLARATION OF RYAN M. LEONARD IN SUPPORT OF REVITALYTE, LLC'S MOTION FOR SUMMARY JUDGMENT**<br><br>**Hearing: Sept. 7, 2022 at 9:00AM**<br><br>**Per Chambers, No Oral Argument Unless Ordered by the Court**<br><br>REDACTED |

I, Ryan M. Leonard, declare as follows:

1. I am over twenty-one years of age and competent to make the following statements.

2. I have personal knowledge of the facts set forth in this Declaration and, if called to testify as a witness, I can and will testify to these facts in a court of law.

3. I am the co-founder and co-owner of Revitalyte, LLC, the defendant and counterclaimant in the above-captioned case. I submit this declaration in support of Revitalyte's Motion for Summary Judgment.

4. I co-founded Revitalyte with my friends including Adam Post and Andrew ("AJ") LaGoo. I met Mr. Post and Mr. LaGoo while attending the University

of Minnesota, which I graduated from in 2011 with a degree in finance and economics.

5. While in college and later after graduation, my friends and I would drink beer or other alcohol beverages at various social events, fraternity parties, or impromptu gatherings among friends. Sometimes after consuming alcohol, my friends and I would feel horrible the morning after, including headaches, fatigue, stomach pain—in other words, a hangover—which would hamper our productivity.

6. In an effort to alleviate these hangover symptoms, we learned that drinking Pedialyte®, an electrolyte solution used to treat dehydration in children, hastened our recovery. Pedialyte® is sold on the baby aisle in grocery stores and other retailers, which made purchasing the product somewhat awkward and embarrassing for college students and young adults.

7. While attending the University of Minnesota, I began working at ChemSol, a chemical supplier, where I still work in purchasing and sales today.

8. In my over decade of employment with ChemSol, I have assisted hundreds of companies in procuring and fulfilling orders for various chemicals and specialty ingredients for use by businesses across several industries, including agriculture, textiles, plastics, oil and gas drilling, water treatment, and food manufacturing.

9. At ChemSol, one of the companies I previously assisted by procuring and fulfilling supplies was Vitalyte Sports Nutrition, Inc., the plaintiff in this action. My interactions with Plaintiff were almost exclusively over email and were limited to communications concerning the procurement of Plaintiff's requested supplies and fulfilling Plaintiff's orders and ensuring Plaintiff paid its invoices.

10. Of the hundreds of business I have interacted with during my employment at ChemSol, Plaintiff was one of the businesses I interacted with the least. Indeed, it was one of the smallest accounts in terms of quantity and dollar

- 2 -

LEONARD DECLARATION ISO
REVITALYTE MSJ
3:21-CV-00880-JO-BGS

volume of orders in which I have assisted. I recall assisting Vitalyte with a total of approximately 100 orders over the roughly six-year period in which I recall Vitalyte placing orders with ChemSol.

11. When I did interact with Plaintiff, I primarily interacted with Mr. Evan Lucas, again almost exclusively over email. I do not recall ever meeting Mr. Lucas in person during the time in which I assisted with Vitalyte's supply orders, and I recall speaking to him on the phone no more than 5 times. The last order I recall assisting Vitalyte with at ChemSol occurred in May 2016. Since then, I have assisted numerous other businesses with their supply orders at ChemSol.

12. While I enjoy and value my work at ChemSol, I have always wanted to start my own business—to create and grow new something from the ground up through hard work and ingenuity and have fun while doing it.

13. In the fall of 2016, I started to get serious about starting a business and discussed the idea with my friends. Based on our experience using Pedialyte® to help us alleviate our hangover symptoms, we began to explore selling an electrolyte replacement solution based on the generic formula for Pedialyte®, but marketing it to adults and selling it in beer, wine, and liquor stores or near where beer, wine, or liquor are sold in grocery or convenience stores.

14. In January 2017, the New York Times Magazine published an article on the use of Pedialyte® titled "Letter of Recommendation: Pedialyte," which discussed the use of Pedialyte® as a way to alleviate hangover symptoms. Attached as Exhibit 1 is a true and correct copy of that article.

15. Around the time of that article, I started to consider product names and discussed potential names with my friends, including over text message. Attached as Exhibit 2 is a true and correct copy of a text message exchange with my friend, Adam Post, during the time period January 23 through 27, 2017. As that text message exchange demonstrates, I wanted a name that rhymed with Pedialyte® to call to mind

the well-known use of that product to alleviate hangover symptoms. After considering several names—including Lifelyte, Rescuelyte, Partyalyte, Athlyte—we chose the name REVITALYTE, which called to mind the word "revitalize" and conveyed the product's intended purpose. Plaintiff had nothing to do with my selection of the REVITALYTE mark for a ready-to-drink electrolyte replacement solution.

16. About a month after selecting REVITALYTE as the brand for our proposed product, I filed a trademark application with the U.S. Patent and Trademark Office ("USPTO") based on my intent to use that mark for the proposed products. Attached as Exhibit 3 is a true and correct copy of my trademark application for REVITALYTE for "electrolyte replacement solutions," Serial No. 87342871, which I filed on February 20, 2017.

17. The USPTO allowed my application to proceed to publication, which I understand notifies the public of pending trademark applications and gives the public an opportunity to oppose an application if they believe they will be harmed by registration of a mark. Attached as Exhibit 4 is a true and correct copy of the notice of publication I received from the USPTO on June 28, 2017, stating that the mark would be published on July 18, 2017. Plaintiff did not oppose this application.

18. In the months that followed, we worked on preparing to begin sales of the REVITALYTE product. This included identifying and working with a co-packer, designing the product packaging, and identifying distributors. In March 2018, we began sales of the product in beer, wine, and liquor stores. Images of our three original products, which are still sold today, are shown below:

- 4 -

LEONARD DECLARATION ISO
REVITALYTE MSJ
3:21-CV-00880-JO-BGS

  

These products have been continuously advertised and promoted, including the display of images of the product, on our website at drinkrevitalyte.com since March 2018.

19. After about two months of sales of our REVITALYTE products, I received an email from Mr. Evan Lucas on May 18, 2018. Attached as Exhibit 5 is a true and correct copy of that email. This was the first communication I had received from Mr. Lucas in more than two years. In it, Mr. Lucas asserted that my business's use of REVITALYTE infringed upon Plaintiff's trademark rights and was confusingly similar to the VITALYTE mark and asked me to stop use of REVITALYTE.

20. I was taken aback by Mr. Lucas's email, as Plaintiff's mark and business played no role in the selection of the REVITALYTE mark and I did not believe it was infringing. To try to resolve this matter, I spoke to Mr. Lucas on the phone, but we never came to a mutually acceptable agreement.

21. Mr. Lucas then emailed me on June 29, 2018, stating that Plaintiff would allow Defendant six months to phase out use of the mark if it agreed to "discontinue all use . . . and in order to avoid expensive and protracted litigation to enforce [its] federally registered trademark rights." Attached as Exhibit 6 is a true and correct

1   copy of that email. I responded on July 2, 2018, stating that "we do not currently have
2   an agreement, but are open to further discussion on this matter."

3   22.  Mr. Lucas did not directly respond to my July 2, 2018 email. Instead, I
4   received a demand letter from Plaintiff's attorney on August 2, 2018. Attached as
5   Exhibit 7 is a true and correct copy of that letter. Plaintiff's attorney contended that
6   "there is strong likelihood of public confusion between our client's use of
7   VITALYTE and your express use of the REVITALYTE mark for competitive
8   products in the same industry" and that Defendant's use of the REVITALYTE mark
9   "constitute[d] intentional, willful infringement of [Plaintiff's] trademark rights."
10  Plaintiff's attorney requested a "written response by August 10, 2018 advising that
11  you [sic] company will immediately cease the use of the REVITALYTE mark."

12  23.  Defendant did not agree to stop use of the mark. Our attorney, Mr.
13  Kenneth Kunkle, responded to Plaintiff's letter on August 9, 2018. Attached as
14  Exhibit 8 is a true and correct copy of that letter. In that letter, Mr. Kunkle stated that
15  "[i]t is Revitalyte's position that, given the number of other marks containing similar
16  component parts ("VITA" and "LYTE") and the real-world context of these mark's
17  application and usage, there are sufficient differences to prevent any potential
18  likelihood of confusion."

19  24.  Mr. Kunkle's letter further stated: "Revitalyte sincerely believes there
20  is little to no chance of likelihood of confusion—however, they believe that there are
21  opportunities for the parties to further distinguish themselves. For this reason,
22  Revitalyte proposes that the parties evaluate the potential to agree on further
23  limitations related [to] product configurations, branding, marketing and trade
24  channels. I look forward to the opportunity to resolve this matter in a manner that
25  benefits both parties."

26  25.  Neither Plaintiff's attorney nor Plaintiff ever responded to Mr. Kunkle's
27  letter. In fact, Defendant received no communication whatsoever from Plaintiff or

- 6 -

LEONARD DECLARATION ISO
REVITALYTE MSJ
3:21-CV-00880-JO-BGS

through its attorneys after this August 9, 2018 letter until Plaintiff served me at my home with this lawsuit on May 14, 2021. I confirmed with Mr. Kunkle that he also did not receive a communication from Plaintiff or its attorneys during this time.

26. Having not received a response from Plaintiff—let alone any communication whatsoever—I understood that Plaintiff no longer objected and consented to our use and registration of the REVITALYTE mark. Based on that understanding, Defendant continued to sell its REVITALYTE-branded ready-to-drink products in beer, wine, and liquor stores and to grow its brand by advertising and promote the product as a remedy for hangover symptoms.

27. Meanwhile, the USPTO registered our REVITALYTE trademark on December 10, 2019. Attached as Exhibit 9 is a true and correct copy of the registration certificate for our REVITALYTE mark, U.S. Reg. No. 5,932,402. Plaintiff did not petition to cancel the REVITALYTE mark in the approximate year-and-a-half between registration and the filing of this lawsuit.

28. The following year was a watershed year for our business. In August 2020, Defendant entered into a licensing agreement with Barstool Sports, a digital media company focused on sports fandom and pop culture. Barstool produces and distributes irreverent podcasts, blogs, and video content via the Internet. Some of Barstool's most popular podcasts include "Plan Bri," a show about navigating your early 20's and college life. Barstool's podcasts, blogs, and video content reach millions of people each year. Attached as Exhibit 10 is a true and correct copy of the Barstool License Agreement. Defendant entered into this agreement based on its understanding that Plaintiff had withdrawn its objection and consented to the use and registration of the REVITALYTE mark.

29. As part of Defendant's license agreement with Barstool, Defendant launched a fourth variety of its REVITALYTE ready-to-drink electrolyte replacement solution product. Referred to as the "Black Label" product, the bottle

- 7 -

LEONARD DECLARATION ISO
REVITALYTE MSJ
3:21-CV-00880-JO-BGS

displays Barstool's barstool logo above the REVITALYTE mark and the words "Black Label By Barstool Sports" below the REVITALYTE mark. An image of the product is shown below:



Along with the original varieties of the REVITALYTE product shown above, the Black Label product is sold on Barstool's website, as well as in beer, wine, and liquor stores and grocery and convenience stores that sell alcohol. Like Defendant's original three REVITALYTE varieties, the Black Label product is a generic version of a Pedialyte® product (here, Pedialyte® Advanced Care Plus) and therefore contain the same ingredients and formulation as that products as required by Defendant's manufacturer.

30. Another part of our agreement with Barstool ███████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████ This agreement is currently in effect.

31. Shortly after entering into the agreement with Barstool, we entered into

1  a Master Distributor Agreement with CANarchy Craft Brewery Collective, one of
2  the largest craft beer companies in the United States in December 2020. Attached as
3  Exhibit 11 is a true and correct copy of that agreement. Defendant entered into this
4  agreement based on its understanding that Plaintiff had withdrawn its objection and
5  consented to the use and registration of the REVITALYTE mark. Our agreement
6  with CANarchy exponentially increased the number of beer, wine, and liquor stores
7  and grocery and convenience stores where REVITALYTE products were sold. This
8  agreement is currently in effect.

9      32.     As part of our agreement with CANarchy, ▇▇▇▇▇▇▇▇
10 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
11 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.

12     33.     In order to fund the upfront and anticipated investments required by
13 these agreements, as well as to further general growth of our company, myself, my
14 family, and my business partner, Mr. Lagoo, made substantial financial
15 commitments. We made these commitments to support and grow Defendant's
16 business around its REVITALYTE mark based on our understanding that, again,
17 Plaintiff had withdrawn its objection and consented to the use and registration of the
18 REVITALYTE mark.

19     34.     Specifically, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
20 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
21 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
22 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

23     35.     ▇▇▇▇▇▇▇▇▇▇▇▇▇▇
24 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
25 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
26 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
27 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
28

SNELL & WILMER
L.L.P.
LAW OFFICES
2001 K STREET, N.W.
SUITE 425 NORTH
WASHINGTON, DC 20006

███████████████████████████████████████
███████████████████████████████.

36. The investments in our business around the REVITALYTE mark have paid off. Based on our profit and loss statements and Quickbooks data produced in this litigation, our annual gross revenues were ████████████ ████████████████████████████ the vast majority of which were earned from sales through retailers who sell beer, wine, and liquor. In other words, our revenues from sales of REVITALYTE products in 2021 were **more than █ times** the revenues we earned in 2018, for a percentage increase of **more than ███%**. It is my understanding that Plaintiff seeks "damages" based on Defendant's sales revenues during this entire period, a number which would have been dramatically lower had Plaintiff not delayed in bringing this lawsuit.

37. Not only does Plaintiff seek to reap the rewards of our investment and hard work, but it also seeks to bar Defendant from using the REVITALYTE mark altogether. Requiring Defendant to stop use of its brand after years of investing in its company, building up goodwill in the REVITALYTE mark, and growing a successful business will cause catastrophic harm to Defendant and those who have supported our business.

38. Conversely, Defendant has not caused any harm to Plaintiff in the last four-and-a-half years. Indeed, after searching and reviewing our company's emails in the course of this litigation, neither myself nor Mr. LaGoo are aware of any inquiries or communications regarding Plaintiff or its products or anything that would indicate a mistaken belief that Defendant or its products are somehow connected with Plaintiff.

39. I continue to strongly believe that Defendant's use of the REVITALYTE mark on ready-to-drink electrolyte replacement solutions does not cause a likelihood of confusion, just as I first told Plaintiff over four years ago.

I declare under the penalty of perjury that foregoing is true and correct.

Executed on June 22, 2022, in Minneapolis, Minnesota

                                                */s/Ryan M. Leonard*
                                                Ryan M. Leonard

SNELL & WILMER
L.L.P.
LAW OFFICES
2001 K STREET, N.W.
SUITE 425 NORTH
WASHINGTON, DC 20006