UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Abbott Laboratories,                                         Civil No. 23-1449 (DWF/DTS)

           Plaintiff,

v.                                                                                  MEMORANDUM
                                                                            OPINION AND ORDER
Revitalyte LLC,

           Defendant.

_____

Caroline Marsili, Esq., Joseph W. Winkels, Esq., Carlson Caspers; Jane Metcalf, Esq., William Francis Cavanaugh, Jr., Esq., Patterson Belknap Webb & Tyler LLP, counsel for Plaintiff.

Mary Hallerman, Esq., Snell &Wilmer LLP; Stephanie M. Laws, Esq., Maslon LLP, counsel for Defendant.

_____

## INTRODUCTION

This matter is before the Court on Defendant Revitalyte LLC's motion for judgment on the pleadings. (Doc. No. 40.) Plaintiff Abbott Laboratories opposes the motion. (Doc. No. 55.) For the reasons set forth below, the Court denies the motion.

## BACKGROUND

**I.       History of Pedialyte**

Abbott is a health care company with a wide range of products. (Doc. No. 22 ("Am. Compl.") ¶ 2.) One of Abbott's most well-known products is an oral electrolyte solution ("OES") that is sold under the Pedialyte trademark. (*Id.*) Pedialyte was launched in 1966 and used as an affordable treatment for mild to moderate dehydration,

especially for children who are more prone to catching gastrointestinal illnesses.  (*Id.* ¶¶ 24, 26.)  Initially, Pedialyte was only sold to medical establishments, but, by 1970, Pedialyte was sold in consumer retail channels.  (*Id.* ¶ 27.)  In 1974, the United States Patent and Trademark Office first approved Abbott's trademark application for "Pedialyte."  (*Id.*)

Today, Pedialyte makes up sixty percent of the sales for ready-to-drink OES products across the country.  (*Id.* ¶ 34.)  In 2021, "5.8% of U.S. households purchased at least one Pedialyte-branded product."  (*Id.* ¶ 35.)  Abbott has consistently invested millions of dollars in marketing Pedialyte through traditional advertisements and through social media.  (*Id.* ¶¶ 49-50.)

Abbott has sold Pedialyte in roughly the same trade dress since the 1980s.  (*Id.* ¶ 54.)  Its trade dress includes "its uniquely shaped plastic bottle, with a wrap-around label encircling the middle 50-60 percent of the bottle and identifying the product as Pedialyte."  (*Id.*)  The bottle shape is rectangular with rounded corners and two ridges that run around the circumference of the bottle above and below the label.  (*Id.*)  The bottle also "reveals the bright colors of the various Pedialyte flavors above and below the wrap-around label," and the label contains a "more muted two-tone color palette."  (*Id.*)  "[T]he bottle's rectangular shape gives way to gently sloped 'shoulders,' which then converge at the product's shrink-wrapped screw-on cap."  (*Id.*)  The bottle was initially 32 ounces, but in 1993, Abbott increased the volume to 33.8 ounces.  (*Id.*)

Abbott asserts that its distinctive trade dress has remained unchanged for decades.  (*Id.* ¶ 57.)  Dating back to the 1990s, Abbott has featured its trade dress in advertisements

and commercials. (*Id.*) And today, "the vast majority of posts on the @Pedialyte Instagram account feature the product's trade dress." (*Id.* ¶ 60.) Abbott has also done consumer research, which has shown that "more than half of U.S. adult consumers associate the bottle shape alone with Pedialyte, even without viewing the wrap-around label or other aspects of the trade dress." (*Id.* ¶ 63 (emphasis omitted).) And while Pedialyte has introduced new OES products, such as powdered products, the ready-to-drink product continues to be more popular. (*Id.* ¶ 64.)

Abbott also asserts that its trade dress is nonfunctional. (*Id.* ¶ 71.) It contends that there is no practical purpose for the "color scheme of the wrap-around label, the size and placement of the wrap-around label, and the color of the product." (*Id.* ¶ 72.) Moreover, Abbott alleges that the shape of the bottle is nonfunctional. (*Id.* ¶ 73.) In fact, in other markets outside of the United States, Pedialyte uses a different tress dress entirely, including different bottle sizes, shapes, and color-schemes. (*Id.*) Abbott asserts that "modern manufacturing methods" allow manufacturers to sell OES products in "virtually any bottle shape." (*Id.* ¶ 74.) Many of Abbott's competitors sell their products in other shapes, sizes, color schemes, and container types. (*Id.* ¶ 68.) And every one of Pedialyte's "branded competitors offer a different line of flavors than Pedialyte." (*Id.* ¶ 69.)

II.     **Introduction of Revitalyte**

Revitalyte is a competitor in the OES market. (*Id.* ¶ 78.) Revitalyte launched its OES product with three of the same flavors as Pedialyte's classic ready-to-drink solution: Strawberry, Grape, and Mixed Fruit. (*Id.* ¶ 86.) Abbott alleges that the Revitalyte bottle

is the same shape and size as Pedialyte's product, with the same size and shape of the wrap-around label and with similar coloring. (*Id.*) Revitalyte's Promotional Guide also indicates that it has an "[i]dentical formula to Pedialyte." (*Id.* ¶ 87.)

In 2021, Revitalyte partnered with Barstool Sports. (*Id.* ¶ 89.) Shortly after, Revitalyte introduced a new product called "Black Label by Barstool Sports." (*Id.* ¶ 89.) Abbott alleges that this product is strikingly similar to Pedialyte's Advanced Care Plus OES product that features less sugar, prebiotics, has 33% more electrolytes, and is available in Chilled Cherry, Iced Grape, and Berry Frost. (*Id.* ¶¶ 41, 90.) Revitalyte's Black Label features less sugar, prebiotics, has 33% more electrolytes, and is available in Berry Frost. (*Id.* ¶ 89.) Abbott further contends that the product has the same look and feel as Pedialyte's Advanced Care Plus product, with a similar bottle size and shape and same size wrap-around label with similar coloring. (*Id.* ¶ 91.)

In an interview, Revitalyte's co-founder, Ryan Leonard, indicated that they wanted their customers to see their product on the shelf of a liquor store or convenience store and say, "that's an adult version of the pediatric products, that's got the same qualities to it, perfect I can buy it here." (*Id.* ¶ 102 (emphasis omitted).) Another co-founder, Adam Post, indicated that they wanted their product to "call to mind" Pedialyte. (*Id.* ¶ 85.) And Revitalyte's 2021 Promotional Guide noted that Revitalyte "leverages its resemblance to Pedialyte to catch the consumer[']s eye and close the add-on purchase." (*Id.* ¶ 7.)

4

### III. Revitalyte's Advertisements

In addition to copying Pedialyte's trade dress, Abbott asserts that Revitalyte "uses the Pedialyte trademark to promote its own product in advertising, on social media, and even on its product packaging." (*Id.* ¶ 112.)

At one point, Revitalyte's website contained various tweets of consumers talking about how embarrassing it was to have to go to the baby aisle to purchase Pedialyte when they were hungover. (*Id.* ¶ 114.) The caption above the tweets said, "Did we mention we've all been there?" (*Id.*) Abbott notes that the website did not "clarify the lack of connection between its OES product and Pedialyte." (*Id.* ¶ 115.) Abbott asserts that the website implied that Revitalyte's OES was Pedialyte, just an adult version. (*Id.*)

Abbott provides various examples of actual customer confusion, where Revitalyte has endorsed an association with Pedialyte. (*Id.* ¶¶ 121-22.) For example, Revitalyte has retweeted various tweets referring to Revitalyte as "the adult version of Pedialyte," "like Pedialyte but for adults," "barstool sports Pedialyte," "barstool sports brand [P]edialyte," "barstool sports branded [P]edialyte," and "Barstool [P]edialyte." (*Id.* ¶¶ 122-23, 150.) Revitalyte also retweeted a tweet praising "#revitalyte by @pedialyte." (*Id.* ¶ 125.) Abbott argues that the repeated references to Pedialyte by Revitalyte has "reinforced the false impression that its OES is a version of Pedialyte, rather than a competitor." (*Id.* ¶ 127 (emphasis omitted).)

Revitalyte also includes "Compare to Pedialyte" language on the shrink-wrapped cap of its drinks. (*Id.* ¶ 128.) While Abbott notes that other "store brands" commonly include such language, it asserts that Revitalyte does so in a way that suggests that

5

Pedialyte has endorsed the product. (*Id.* ¶¶ 129-37.) For example, in one ad, Revitalyte photoshopped a bottle of its OES drink into the hands of Leonardo DiCaprio. (*Id.* ¶ 135.) In the image, the only mark visible is "Pedialyte," as the Revitalyte mark is covered by DiCaprio's hands. (*Id.*)

### IV. Allegations of Reputational Harm

Abbott further alleges that Revitalyte has tarnished the Pedialyte brand by associating Pedialyte with "the endorsement of heavy drinking among young adults." (*Id.* ¶ 154.) Revitalyte often markets its product as a hangover cure. (*Id.* ¶¶ 154-55.) It's 2021 Promotional Guide lists "College Partiers" as one of its target demographics. (*Id.* ¶ 158.)

Abbott describes several of Revitalyte's advertisements as "vulgar[] and crass[]." (*Id.* ¶ 163.) Abbott alleges that Revitalyte's use of the Pedialyte mark to market its products has tarnished the Pedialyte brand. (*Id.* ¶ 152.)

### V. Procedural Posture

Abbott brought this suit against Revitalyte, asserting the following claims: (1) trade dress infringement; (2) trademark infringement; (3) unfair competition, false designation or origin, and false advertising; (4) trademark and trade dress dilution by tarnishment; and (5) violations of the Minnesota Deceptive Trade Practices Act ("MDTPA"). Abbott filed an Amended Complaint, and now Revitalyte moves for judgment on the pleadings.

## DISCUSSION

The Court evaluates a motion for judgment on the pleadings under the same standard as a motion brought under Federal Rule of Civil Procedure 12(b)(6). *Ashley Cnty. v. Pfizer, Inc.*, 552 F.3d 659, 665 (8th Cir. 2009). In deciding a motion to dismiss under Rule 12(b)(6), a court assumes all facts in the complaint to be true and construes all reasonable inferences from those facts in the light most favorable to the complainant. *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir. 1986). A court may consider the complaint, matters of public record, orders, materials embraced by the complaint, and exhibits attached to the complaint in deciding a motion to dismiss under Rule 12(b)(6). *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999). To survive a motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Although a complaint need not contain "detailed factual allegations," it must contain facts with enough specificity "to raise a right to relief above the speculative level." *Id.* at 555.

Abbott brings five claims against Revitalyte. Revitalyte argues that the Court should dismiss the Amended Complaint.

**I.     Trade Dress Infringement**

Abbott first brings a claim of trade dress infringement against Revitalyte. Abbott asserts that its Pedialyte trade dress encompasses the following features:

> [R]ectangular clear plastic bottle with rounded corners; brightly colored visible liquids; a wrap-around label encompassing the middle 50 percent of the bottle with the Pedialyte brand name parallel to the bottom of the bottle; "ribs" just above and below the wrap-around label; gently sloping shoulders beginning a half-inch or so above the upper ridge and leading to a screw-on

7

cap; and brightly colored liquids visible through the bottle, contrasting with the more muted palette of the branded wrap-around label.

(Am. Compl. ¶ 57.)

To establish a trade dress infringement claim under 15 U.S.C. § 1125(a)(1), a party must demonstrate that its trade dress is "(1) inherently distinctive or acquired distinctiveness through secondary meaning; (2) nonfunctional; and (3) its imitation would result in a likelihood of confusion in consumers' minds as to the source of the product." *Gateway, Inc. v. Companion Prods., Inc.*, 384 F.3d 503, 507 (8th Cir. 2004). Revitalyte focuses on the second element and argues that Abbott has not pled sufficient facts to support a plausible claim that Pedialyte's trade dress is nonfunctional. Specifically, Revitalyte asserts that an expired utility patent proves that the trade dress is in fact functional.

A feature of a product is functional if "it is essential to the use or purpose of the article or if it affects the cost or quality of the article." *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 32 (2001) (internal quotations and citation omitted). The Supreme Court has stated that the existence of "[a] utility patent is strong evidence that the features therein claimed are functional." *Id.* at 29. Revitalyte asks the Court to take judicial notice of Abbott's prior utility patent related to Pedialyte's trade dress, U.S. Patent No. 5,217,737 ("'737 Patent"). (*See* Doc. No. 43-1 at 54.)

The Court will take notice of the '737 Patent. *See Parking World Wide, LLC v. St. Louis*, No. 22-cv-1252, 2024 WL 1177989, at *2 (E.D. Mo. Mar. 19, 2024) (taking judicial notice of a utility patent because the patent was "integral to the asserted claims, a

8

matter of public record, and its authenticity [was] not in dispute"). Abbott acquired this Patent in 1993. (Doc. No. 43-1 at 54.) The purpose of the '737 Patent was to reduce problems associated with the sterilization of plastic bottles. (*Id.* at 62.) The Patent contained several embodiments of the invention that was intended to prevent container deformation during the sterilization process. (*Id.* at 59-61.) One such embodiment corresponds with Pedialyte's current trade dress. Namely, the Patent depicts a rectangular bottle with rounded corners and two ridges that run around the circumference near the top and bottom. (*Id.* at 61.)

Revitalyte argues that the expired utility patent proves as a matter of law that the Pedialyte trade dress is functional. In response, Abbott argues that the bottle shape is just one aspect of the Pedialyte trade dress. The trade dress also includes other elements, such as "the coloring of the product, cap, and label; the size and orientation of the label; the indentation between the bottle's ribs; and the shrink-wrapped cap." (Doc. No. 55 at 36 (citing Am. Compl. ¶¶ 54-55).) While Revitalyte asserts that these additional elements are also functional, the Court finds some of these arguments to be premature. For example, Revitalyte argues that the placement and size of the wrap-around label is functional because many OES products use the same type of labeling and common use by third parties may indicate functionality. At the pleadings stage, however, the Court is not in a position to examine what is common in the industry, and the case Revitalyte relies on for this argument, *Talking Rain Beverage Co Inc. v. S. Beach Beverage Co.*, 349 F.3d 601, 605 (9th Cir. 2003), involved an appeal from a summary judgment decision.

Revitalyte's arguments that the shrink-wrapped cap and specific coloring of liquid are functional are similarly premature. While colors are often used to indicate flavor, the Court cannot say, for example, whether Revitalyte's decision to use the same tone of orange as Pedialyte for its "mixed fruit" drink was functional. Nor can the Court determine at this time whether the shrink-wrapped cap was necessary to prevent leakage. These are all issues of fact that will be decided at a later stage in the proceedings.

Regarding the bottle shape, Abbott argues that improvements to the manufacturing process since 1993 have eliminated the need for "specialized packaging designs." (Doc. No. 55 at 23.) Abbott alleges that "modern manufacturing methods" allow manufacturers to sell OES products in "virtually any bottle shape." (Am. Compl. ¶ 74.) While Revitalyte urges the Court to hold Abbott to the claims it made in the '737 Patent over thirty years ago, Abbott has put forth plausible allegations that the manufacturing process has since changed. As an example, Pedialyte itself now uses different sized and shaped bottles in other markets outside the country. (*Id.* ¶ 73.) "[W]hat was once functional may . . . later be ornamental. Passage of time diminishes a utility patent's significance." *Georgia-Pac. Consumer Prod. LP v. Kimberly-Clark Corp.*, 647 F.3d 723, 730 (7th Cir. 2011) (internal quotations and citation omitted). The Supreme Court in *TrafFix* further acknowledged that a party may demonstrate that the features in an expired utility patent are no longer functional. *TrafFix*, 532 U.S. at 30. Of course, the burden is on Abbott to demonstrate that manufacturing processes have changed such that its expired utility patent is no longer functional. But at this time, Abbott has plausibly alleged that its trade dress is non-functional.

Because Abbott has plausibly pled a claim of trade dress infringement, the Court denies Revitalyte's motion for judgment on the pleadings as to that claim.

## II. Trade Dress Dilution

Abbott next asserts a claim of trade dress dilution under 15 U.S.C. § 1125(c). "Dilution occurs when consumers associate a famous mark that has traditionally identified the mark holder's goods with a new and different source." *Luigino's, Inc. v. Stouffer Corp.*, 170 F.3d 827, 832 (8th Cir. 1999). Revitalyte argues that the Court should dismiss Abbott's trade dress dilution claim because Abbott has not plausibly pled that Pedialyte's trade dress is famous.

"[A] mark is famous if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner." 15 U.S.C. § 1125(c)(2)(A). When determining whether a mark is famous, the Court considers a number of factors, including: (1) "[t]he duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties"; (2) "[t]he amount, volume, and geographic extent of sales of goods or services offered under the mark"; (3) "[t]he extent of actual recognition of the mark"; and (4) whether the mark is registered. *Id.*

Abbott alleges that Pedialyte has used substantially the same trade dress since the 1980s. (Am. Compl. ¶ 54.) Pedialyte has spent millions of dollars on advertisements, and the advertisements often feature Pedialyte's trade dress. (*Id.* ¶¶ 50, 57-61.) Pedialyte markets to the entire country, and, in 2021, around 5.8 percent of the U.S. population purchased at least one Pedialyte-branded product. (*Id.* ¶ 35.) Pedialyte's ready-to-drink

11

OES product makes up sixty percent of the dollar sales in the ready-to-drink OES category across the country.  (*Id.* ¶ 34.)  The amount, volume, and geographic extent of the sales of Pedialyte is exceedingly large.  While Revitalyte argues that Abbott has not done enough to separate the fame of the Pedialyte mark from Pedialyte's trade dress, the Court disagrees.  Abbott has put forth allegations highlighting the money the company has spent advertising not just the Pedialyte trademark, but also its trade dress.  The Pedialyte trade dress has been used since the 1980s.  And Revitalyte's own Promotional Guide acknowledged Pedialyte's recognizable trade dress by noting that the company "leverages its resemblance to Pedialyte to catch the consumer[']s eye."  (*Id.* ¶ 7.)  Abbott has put forth sufficient facts at this stage to plausibly support a claim that Pedialyte's trade dress is famous.  The Court therefore denies Revitalyte's motion for judgment on the pleadings as to this claim.

### III.    Trademark Infringement and False Designation

Additionally, Abbott alleges claims of trademark infringement and false designation of origin under 15 U.S.C. § 1125.  "These claims require proof of trademark ownership and the alleged infringer's use of the mark 'in connection with goods or services in a manner likely to cause customer confusion as to the source or sponsorship of the goods or services.'"  *Zerorez Franchising Sys., Inc. v. Distinctive Cleaning, Inc.*, 103 F. Supp. 3d 1032, 1040 (D. Minn. May 5, 2015) (quoting *Cmty. of Christ Copyright Corp. v. Devon Park Restoration Branch of Jesus Christ's Church*, 634 F.3d 1005, 1009 (8th Cir. 2011)).

Abbott has ownership of the Pedialyte trademark, but Revitalyte argues that Abbott has not pled enough facts to plausibly allege confusion. The Court looks at six factors when determining whether a defendant used a mark in a manner likely to cause customer confusion:

> (1) the strength of the owner's mark; (2) the similarity between the owner's mark and the alleged infringer's mark; (3) the degree to which the products compete with each other; (4) the alleged infringer's intent to "pass off" its goods as those of the trademark owner; (5) incidents of actual confusion; and (6) the type of product, its costs and conditions of purchase.

*Frosty Treats Inc. v. Sony Comput. Ent. Am. Inc.*, 426 F.3d 1001, 1008 (8th Cir. 2005) (internal quotations and citation omitted). Likelihood of confusion is a question of fact and thus trademark infringement claims are not usually resolved on a motion to dismiss or motion for judgment on the pleadings. *See Battle Sports Sci., LLC v. Shock Doctor, Inc.*, 225 F. Supp. 3d 824, 838 (D. Neb. 2016). But a court may dismiss a claim if it is "so patently implausible." *Id.*

Here, Revitalyte argues that its use of the "Compare to Pedialyte" language on its labeling is nominative fair use and asserts that the other allegations of infringement and examples of actual confusion are "*de minimis*." (Doc. No. 57 at 18, 21.) "The nominative fair use doctrine protects trademark use when the only practical way to refer to something is to use the trademarked term." *Teter v. Glass Onion, Inc.*, 723 F. Supp. 2d 1138, 1156 (W.D. Mo. 2010) (internal quotations and citation omitted). For the doctrine to apply, the Court considers the six above factors and three additional ones: (1) whether "the product or service in question" is "one not readily identifiable without use of the trademark"; (2) whether "only so much of the mark or marks" is "used as is reasonably

13

necessary to identify the product or service"; (3) whether the user did anything "that would, in conjunction with the mark, suggest sponsorship or endorsement by the trademark holder." *New Kids on the Block v. News Am. Publ'g, Inc.*, 971 F.2d 302, 308 (9th Cir. 1992).

Revitalyte argues that "compare to" language is frequently used by other brands and cites cases holding that the use of such language is nominative fair use. But those cases did not include incidents of actual confusion or conduct suggesting sponsorship or endorsement and many of the cases were not resolved at the pleadings stage. *See Weight Watchers Int'l, Inc. v. Noom*, 403 F. Supp. 3d 361, 379-80 (S.D.N.Y. 2019) (noting that there was no allegation of actual confusion or allegations that suggest sponsorship or endorsement); *Beachbody LLC v. Universal Nutrients, LLC*, No. 16-cv-2015, 2016 WL 3912014, at *2 (C.D. Cal. July 18, 2016) ("Plaintiff does not provide any evidence of consumers actually associating the two brands because of the OmniHealth packaging."); *Am. Home Prods. Corp. v. Barr Lab'ys, Inc.*, 656 F. Supp. 1058, 1070 (D.N.J. 1987) ("[T]here is no evidence of actual confusion between the two tablets.").

In this case, Abbott has put forth allegations that Revitalyte, in conjunction with using the Pedialyte mark on its labeling, has acted in a way that suggests sponsorship and endorsement by Pedialyte. For example, Revitalyte disseminated an ad where the Revitalyte mark was covered and the only mark visible was the Pedialyte mark. (Am. Compl. ¶¶ 134-36.) Abbott has also put forth evidence of Revitalyte retweeting comments referring to Revitalyte as "the adult version of Pedialyte," "like Pedialyte but

14

for adults," "barstool sports Pedialyte," "barstool sports brand [P]edialyte," "barstool sports branded [P]edialyte," and "Barstool [P]edialyte." (*Id.* ¶¶ 122-23, 150.)

These comments also provide examples of actual consumer confusion. In those situations, Revitalyte did not dispel the confusion and instead retweeted the comments. Revitalyte argues that examples of customers asking whether Revitalyte is a Pedialyte brand is not evidence of actual confusion because questions about the affiliation of two companies shows that the customers are aware that the products are from different sources. *See Duluth News-Trib., a Div. of Nw. Publ'ns, Inc. v. Mesabi Pub. Co.*, 84 F.3d 1093, 1098 (8th Cir. 1996). But Abbott provides examples of confusion that go above and beyond questions of affiliation. As noted above, Abbott has provided numerous tweets of consumers referring to Revitalyte as "barstool sports branded [P]edialyte" and "barstool sports [P]edialyte." (Am. Comp. ¶¶ 123-26.) In another example, a consumer asked, "Why does Barstool Sports sell [P]edialyte[?]" and yet another thanked "#revitalyte by @pedialyte." (*Id.* ¶¶ 123-25.) "[T]he existence of consumer confusion necessitates focusing on the minds of the relevant purchasers—an analysis based on a factual inquiry inappropriate to a motion to dismiss." *Merck & Co., Inc. v. Mediplan Health Consulting, Inc.*, 425 F. Supp. 2d 402, 414 (S.D.N.Y. 2006) (internal quotations and citation omitted).

Overall, Abbott has provided multiple examples of Revitalyte's use of the Pedialyte mark, including the "compare to" language, references to Revitalyte as being a Pedialyte product, and examples of actual customer confusion. Together, these allegations plausibly give rise to consumer confusion as to the origin or sponsorship of

the product. *See id.* (denying motion to dismiss because the plaintiff plausibly alleged that the use of its mark in close proximity to the word "generic" on the defendants' websites could "give rise to consumer confusion as to the origin or sponsorship of the product"). The Court therefore denies Revitalyte's motion for judgment on the pleadings as to this claim.

IV.   **Trademark Dilution**

Abbott's next claim is for trademark dilution under 15 U.S.C. § 1125(c). Trademark dilution occurs when a mark has become famous and another person "commences use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark." *Id.* Abbott alleges dilution by tarnishment. Dilution by tarnishment "is association arising from the similarity between a mark or trade name and a famous mark that harms the reputation of the famous mark." *Id.*

Revitalyte argues that the Court should dismiss this claim because Abbott has only alleged that Revitalyte references the Pedialyte mark and has not alleged that Revitalyte uses the Pedialyte mark as a mark of its goods. Abbott, however, has cited examples of instances where Revitalyte has used the Pedialyte mark to market its product. For example, Revitalyte has retweeted tweets referring to Revitalyte as "the adult version of Pedialyte," "barstool sports Pedialyte," "Barstool [P]edialyte," "barstool sports brand [P]edialyte," and "Barstool-branded Pedialyte." (*Id.* ¶¶ 122-23.) Revitalyte also retweeted a tweet thanking "#revitalyte by @pedialyte." (*Id.* ¶ 125.) In other words, Abbott plausibly alleges that Revitalyte has used the Pedialyte mark in conjunction with

16

its advertising to indicate the source of its goods. *See Parts.com, LLC v. Yahoo! Inc.*, No. 13-cv-1078, 2014 WL 2573321, at *5 (S.D. Cal. June 9, 2014) (noting that "targeted advertising that incorporates another's trademark may constitute use of that mark in commerce" for purposes of a trademark dilution claim). And while Revitalyte may argue that these are isolated occurrences, the Court is not in a position now to evaluate that argument.

Moreover, Abbott has alleged that its trademark has been portrayed in a way that harms the reputation of the Pedialyte mark, as Revitalyte's advertisements feature references to heavy drinking by young adults, encourage excessive consumption of alcohol, and often feature other conduct that could be described as vulgar and crass, including the use of expletives and suggestive placement of the product. (*See* Am. Compl. ¶¶ 154-65.) These allegations plausibly give rise to a claim of trademark dilution. The Court therefore denies Revitalyte's motion for judgment on the pleadings as to this claim.

### V.     Minnesota Deceptive Trade Practices Act

Lastly, Abbott alleges claims under the MDTPA. Revitalyte argues that these claims require the same analysis as claims under the Lanham Act and should therefore be dismissed for the same reasons as the federal claims. *See Rainbow Play Sys. v. GroundScape Techs., LLC*, 364 F. Supp. 2d 1026, 1039 (D. Minn. 2005) ("Claims for deceptive trade practices under Minnesota statute require the same analysis as claims under [the] federal Lanham Act."). Because the Court has not dismissed Abbott's federal claims, these MDTPA claims also survive.

17

**ORDER**

Based upon the foregoing, and the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Revitalyte's motion for judgment on the pleadings (Doc. No. [40]) is **DENIED.**

Dated:  August 13, 2024              s/Donovan W. Frank
                                     DONOVAN W. FRANK
                                     United States District Judge