**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MINNESOTA**

| | | |
|---|---|---|
| ABBOTT LABORATORIES,<br><br>Plaintiff,<br><br>v.<br><br>REVITALYTE LLC,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 0:23-cv-01449-DWF-DTS |

**PLAINTIFF ABBOTT LABORATORIES'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO PRECLUDE EXPERT TESTIMONY FROM REVITALYTE'S "REBUTTAL" EXPERT**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT .......... 1

FACTUAL BACKGROUND .......... 3

A. The Issues of Likelihood of Confusion and the Relevance of Private-Label Pedialyte Competitors Have Been a Focus of This Case Since It Began .......... 3

B. Dr. Thomas Keller's Opening Expert Report on Private Label Products Versus Branded Products .......... 4

C. Revitalyte's Survey "Rebuttal" to Dr. Keller's Opening Report on Private Label Versus Branded Products .......... 6

D. Dr. Maronick's New Report Is In Fact A Thinly Disguised Attempt to Replace His Debunked Opening Report .......... 7

ARGUMENT .......... 8

I. The Court Should Strike Dr. Maronick's Rebuttal Report Because It Is Not Proper Rebuttal Testimony .......... 8

A. Legal Standard .......... 8

B. Dr. Maronick's "Rebuttal" Does Not Respond to Dr. Keller's Report .......... 9

II. In the Alternative, Abbott Seeks Leave to Depose Dr. Maronick and File a Surrebuttal Expert Report .......... 14

CONCLUSION .......... 15

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Faith Reg'l Health Servs. v. Ironshore Indem., Inc.*,
2023 WL 1798328 (D. Neb. Feb. 7, 2023) .......... 13

*In re Air Crash Near Kirksville, MO on Oct. 19, 2004*,
2007 WL 2363505 (E.D. Mo. Aug. 16, 2007) .......... 9

*Kar v. Safeco Ins. Co. of Am.*,
2025 WL 2305773 (E.D. Mo. Aug. 8, 2025) .......... 9, 12, 13

*Marmo v. Tyson Fresh Meats*,
457 F.3d 748 (8th Cir. 2006) .......... 2, 8, 11, 13, 14

*United States v Bos. Sci. Corp.*,
2021 WL 1661255 (D. Minn. Apr. 28, 2021) .......... 9, 11

*Wonch v. Meyer*,
2016 WL 715750 (D. Neb. Feb. 22, 2016) .......... 9

*X Soc. Media LLC v. X Corp.*,
2025 WL 1295280 (M.D. Fla. May 5, 2025) .......... 10

## Statutes

Fed. R. Civ. P. 26(a)(2)(D)(ii) .......... 1, 8, 12

## PRELIMINARY STATEMENT

Plaintiff Abbott Laboratories ("Abbott") moves to preclude rebuttal testimony from Defendant Revitalyte LLC's ("Revitalyte's") expert, Dr. Thomas Maronick, on the grounds that Dr. Maronick's purported rebuttal report is improper and subject to exclusion under Rule 26(a)(2)(D)(ii). Dr. Maronick's report is in no way "intended solely to contradict or rebut evidence on the same subject matter identified by" Dr. Thomas Keller, a marketing professor at the University of North Carolina who focuses his research on private label marketing and expert witness whom Dr. Maronick purports to rebut. Dr. Maronick's report—which is based on ***a new consumer survey*** that Dr. Maronick conducted and does not address any evidence discussed in Dr. Keller's report—is in fact a second affirmative report masquerading as a rebuttal and is intended to replace the deeply flawed disclosure Dr. Maronick submitted earlier in this case.

Revitalyte's primary defense in this infringement case is that the presence of private label (*i.e.*, "store brand") Pedialyte competitors that supposedly mimic the Pedialyte trade dress is so prolific as to preclude Abbott from showing that Revitalyte's oral electrolyte solution products is any more likely than private-label products to cause confusion with Pedialyte. To debunk this defense, Dr. Keller opined that Revitalyte lacks the defining characteristics of private-label products, which enable consumers to recognize those products as alternatives to leading brands. This belies Revitalyte's claim that it is no more likely to confuse consumers than private-label products. The report is grounded in marketing research, materials and testimony provided in this case, and Dr. Keller's analysis

of the products at issue through the lens of the "4Ps in marketing" (place of sale, product characteristics, price, and promotion).

Revitalyte's "rebuttal" to Dr. Keller's report from its survey expert, Dr. Maronick, failed to respond to any of these points. The "rebuttal" does not address any differences between private label products and branded products; does not discuss how consumers perceive the two different types of products; and makes no mention of any analysis set forth in Dr. Keller's report. Instead, Dr. Maronick conducted a brand-new consumer survey in which respondents were shown an image of one Revitalyte product and asked questions about who manufactured the product. Relying on those survey results, Dr. Maronick reached the affirmative conclusion that there is no likelihood of confusion between Revitalyte products and Pedialyte.

Asserting an affirmative conclusion like this is not a proper function of a rebuttal report, which must "explain, repel, counteract, or disprove evidence of the adverse party," and "may be used [only] to challenge the evidence or theory of an opponent—and not to establish a case-in-chief." *Marmo v. Tyson Fresh Meats*, 457 F.3d 748, 759 (8th Cir. 2006) (citation and quotation marks omitted). By all indications, Dr. Maronick's purported rebuttal is a thinly disguised attempt to correct for the previous report he issued in this case—which was based on a different survey he ran and was subsequently exposed as deficient. Dr. Maronick's report should be stricken.

In the event that the Court does not strike Dr. Maronick's new report (it should), Abbott respectfully requests that the scheduling order be modified to allow Abbott three weeks to serve a surrebuttal to Dr. Maronick's new report and depose him.

## FACTUAL BACKGROUND

### A. The Issues of Likelihood of Confusion and the Relevance of Private-Label Pedialyte Competitors Have Been a Focus of This Case Since It Began

Abbott asserts claims against Revitalyte for trade dress and trademark infringement, unfair competition, and dilution by tarnishment based on Revitalyte's decisions to build its business on the back of Abbott's world-famous Pedialyte trademark and trade dress. *See* Dkt. 22 ¶¶170-203 (Abbott's operative complaint). From the outset, two issues that have been a focus of the parties' arguments and discovery efforts are (1) whether there is a likelihood of consumer confusion between Revitalyte's trade dress and Pedialyte's and (2) Revitalyte's defense that Abbott cannot show that its Pedialyte trade dress has secondary meaning because it allegedly failed to police "private label" or "store brand" products that supposedly mimic the Pedialyte trade dress. *See, e.g.*, Dkt. 75 at 13, 15-16, 18-23, 26 (Revitalyte moving to compel discovery on the basis that it was relevant in assessing likelihood of confusion); *id.* at 16-21 (Revitalyte moving to compel discovery concerning Abbott's efforts "to police" competitors using the Pedialyte trade dress or mark). This is unsurprising given that "likelihood of confusion" and whether Pedialyte's trade dress has "acquired distinctiveness through secondary meaning" are two of the three elements of Abbott's trade dress infringement claim. Dkt. 67 at 8.[1]

---

[1] Indeed, in Revitalyte's recent brief in support of its motion for summary judgment, it spends 26 pages addressing these two elements, Dkt. 141 at 20-46, and repeats its longstanding argument that Abbott's "acquiescence" to "private label" products that mimic the Pedialyte trade dress precludes Abbott from proving secondary meaning, *id.* at 34.

### B. Dr. Thomas Keller's Opening Expert Report on Private Label Products Versus Branded Products

On September 24, 2025, Abbott served a report from its affirmative expert, Dr. Thomas Keller. *See* Ex. 1 (the "Keller Report").[2] Dr. Keller holds a Ph.D. in marketing and teaches at the University of North Carolina's business school. *Id.* ¶9. Central to his research are private label branding strategies—*i.e.*, strategies for "a product that is typically owned by a retailer," which are "in contrast to an independent (national) brand typically owned by a manufacturer." *Id.* ¶¶2, 5. For more than a decade, Dr. Keller has researched the differences between private label products and branded products and how those differences affect consumer perceptions. *See id.* ¶¶1-11. Dr. Keller is not a survey expert and did not conduct a survey. As he explained in his report, his opinion in this case is not based "on survey-based measures of consumer perception," but instead on his "research and experience in the field of marketing and private label branding." *Id.* ¶¶3, 4.

The subject that Dr. Keller's report addresses is "whether Revitalyte exhibits characteristics commonly associated with private labels, and how those characteristics or the absence thereof may affect consumer perceptions of Revitalyte, including relative to the competing national brand Pedialyte." *Id.* ¶3. To analyze whether Revitalyte was more like a private label product or a branded product, Dr. Keller considered "the 4Ps in marketing," which are ***place*** (how and where the product is made available to consumers), ***product*** (the characteristics of the product offering itself, including how it is branded,

[2] All cites to "Ex." are to the exhibits appended to the November 26, 2025 Declaration of Jane Metcalf.

positioned, packaged, and presented to consumers), ***price*** (how the product is positioned in terms of cost and value relative to alternatives in the space), and ***promotions*** (the marketing communication and visibility efforts that support the product). Keller Report ¶¶15-21, 30.

***First***, Dr. Keller used the 4Ps to explain how the differences between private labels and branded products, *see id.* ¶¶31-55, "provide clear signals that allow consumers to recognize private labels as retailer-owned alternatives, separate and apart from the national brands they resemble." *Id.* ¶59. ***Next***, Dr. Keller used the 4Ps to assess how consumers are likely to perceive Revitalyte's products as other than private label products. *Id.* ¶¶62-65. Because Revitalyte (1) sells its products nationally through a range of retailers, (2) sells products in a single category under a "stand-alone" name, (3) designed its products to "mirror[] the packaging of Pedialyte like a private label but does not follow the broader design strategies that consumers typically associate with private labels," (4) positions its products distinctly from that of private labels, (5) mimics Pedialyte's product lines and uses the same price points, and (6) uses advertising to create a lifestyle identity for its products, *see id.* ¶¶66, 67, 70-72, 74-85, Dr. Keller concludes that "a meaningful segment of consumers is likely to perceive Revitalyte as affiliated with Pedialyte." *Id.* ¶103. ***Finally***, Dr. Keller further opined that "[c]ategory-dress-code similarity (including bottle form, label configuration, color scheme), and use of the 'Compare to Pedialyte' label heighten perceived relatedness [between the two products], especially under low-involvement conditions common to the convenience context." *Id.*

### C. Revitalyte's Survey "Rebuttal" to Dr. Keller's Opening Report on Private Label Versus Branded Products

On October 22, 2025, Revitalyte served a purported "rebuttal" to the Keller Report from Dr. Thomas Maronick. *See* Ex. 2. Despite being styled as a rebuttal, Dr. Maronick's report does not engage with Dr. Keller's analysis at all. Dr. Maronick never once addresses the differences between private labels and branded products, the 4Ps in marketing, or any other aspect of Dr. Keller's methodology. Instead, Dr. Maronick's report is based entirely on a new consumer survey in which participants were shown images of a single Revitalyte product (and a control product) and asked questions about who makes these products. *Id.* at 9-23. According to Dr. Maronick, the results of this survey show that Revitalyte products "do not cause a likelihood of confusion with the Pedialyte Trade Dress." *Id.* at 23.

Dr. Maronick barely makes any pretense of responding to Dr. Keller's report. He admits up front that Dr. Keller "did not base his opinions and conclusions in his expert report on a survey, but on his 'analyses' and 'own research and experience in the field of marketing and private label branding' and certain materials filed or produced in this litigation." *Id.* at 6-7. Dr. Maronick draws only two connections between his report and Dr. Keller's. First, he asserts that his survey results rebut Dr. Keller's conclusion that "a meaningful segment of consumers is likely to perceive Revitalyte as affiliated with Pedialyte." *Id.* at 6, 7, 23 (citation omitted). And second, Dr. Maronick states that his survey design (which shows customers images of products with no context) is appropriate because Dr. Keller noted once in his 35-page report that customers often encounter Revitalyte in isolation and that Revitalyte uses the "dress code" of Pedialyte on its products.

*Id.* at 13-14 (citing Keller Report at 32, 34). Those are the only instances in which Dr. Keller's report is even cited in the analysis section of Dr. Maronick's report.

### D. Dr. Maronick's New Report Is In Fact A Thinly Disguised Attempt to Replace His Debunked Opening Report

While Dr. Keller did not conduct a survey, Dr. Maronick himself served an opening expert report based on a different survey on August 15, 2025—nearly 10 weeks before serving his "rebuttal."[3] Ex. 3. Just like in his "rebuttal," Dr. Keller concluded in his opening report that a survey he ran showed that "the Current Revitalyte Products do not cause a likelihood of confusion with the Pedialyte Trade Dress." *Id.* at 29. But there is a key difference between Dr. Maronick's two reports: his opening report was based on a *Squirt* survey, while his "rebuttal" is based on an *Eveready* survey.[4] After issuing his opening report, though before serving his "rebuttal," Dr. Maronick declared at his deposition that the *Squirt* format was the only appropriate one for this case and that, "if it's a trade dress matter, an *Eveready* survey is not an appropriate [survey]." Ex. 4 at 111:14-

[3] Revitalye's affirmative report was served before Abbott's because of an amendment to the scheduling order. Abbott had sought a stay of the deadlines in this case based on the parties' settlement discussions at that time, and while that motion was denied, Magistrate Judge Schultz extended Abbott's time to serve its initial expert reports to September 24, 2025 and any rebuttals to those reports from Revitalyte to October 22, 2025. *See* Dkt. 132. The earlier deadlines for Revitalyte to serve its opening expert reports and for Abbott's rebuttals were left in place. *See id.*; *see also* Dkt. 120.

[4] In Dr. Maronick's opening *Squirt* survey, participants were first shown an image of a Pedialyte product and then shown an array of images of several other beverages, including a Revitalyte (or control) product. Ex. 3 at 13-21. In Dr. Maronick's "rebuttal" *Eveready* survey, images of a single Revitalyte product (or control product) were shown and respondents were asked questions about who made the product. Ex. 2 at 9-17.

112:8. Yet now, in his purported rebuttal, Dr. Maronick opines that an "*Eveready* design is appropriate here." Ex. 2 at 13.

Dr. Ran Kivetz—a tenured marketing professor at Columbia University Business School who has conducted and evaluated thousands of surveys—issued Abbott's rebuttal to Dr. Maronick's opening report, in which he excoriated Dr. Maronick's report for a number of reasons, the first being that Dr. Maronick should have used an *Eveready* survey. Ex. 5 ¶23. This left Revitalyte with an implausible (at best) opening expert opinion, which it has now tried to replace with Dr. Maronick's new report. By all indications, Dr. Maronick's sudden reversal does not stem from an authentic or principled change in opinion, but instead from a desire to replace his opening report after Abbott exposed fundamental defects in it.

## ARGUMENT

### I. The Court Should Strike Dr. Maronick's Rebuttal Report Because It Is Not Proper Rebuttal Testimony

#### A. Legal Standard

The Federal Rules of Civil Procedure permit rebuttal expert reports "solely to contradict or rebut evidence on the same subject matter identified by" another expert witness. Fed. R. Civ. P. 26(a)(2)(D)(ii). Thus, a rebuttal report must "explain, repel, counteract, or disprove evidence of the adverse party," and "may be used [only] to challenge the evidence or theory of an opponent—and not to establish a case-in-chief." *Marmo*, 457 F.3d at 759 (citation and quotation marks omitted). Accordingly, courts regularly strike rebuttal expert reports that do not address the evidence offered by the expert

they purport to rebut. *See United States v Bos. Sci. Corp.*, 2021 WL 1661255, at *2-5 (D. Minn. Apr. 28, 2021) (striking rebuttal report because it "does not rebut [the adverse expert's] report and is instead an affirmative opinion on" an issue in the case), *aff'd,* 2021 WL 2221576 (D. Minn. June 2, 2021); *Kar v. Safeco Ins. Co. of Am.*, 2025 WL 2305773, at *9 (E.D. Mo. Aug. 8, 2025) (striking rebuttal opinion because it did "not sufficiently explain how [the rebuttal expert] took the evidence that [the first expert] used as a basis for her rebuttal opinions and provided a different opinion or an analysis of her opinions"); *Wonch v. Meyer*, 2016 WL 715750, at *2 (D. Neb. Feb. 22, 2016) (striking rebuttal report because it offered "no opinions which rebut or even comment on the opinions of" the expert it was purportedly rebutting); *In re Air Crash Near Kirksville, MO on Oct. 19, 2004*, 2007 WL 2363505, at *3 (E.D. Mo. Aug. 16, 2007) (striking rebuttal report because it "addresses entirely different subjects" from the report it purported to rebut).

**B. Dr. Maronick's "Rebuttal" Does Not Respond to Dr. Keller's Report**

Dr. Maronick's opinion is a "rebuttal" in name only. It does not address any of the evidence discussed in Dr. Keller's report; in fact, it concerns a totally different subject matter. Dr. Keller's report is about whether Revitalyte's marketing efforts conform with how companies market and advertise private labels, and how consumer perceptions of Revitalyte and its similarity to Pedialyte may differ depending on whether it is viewed as a private label or a national brand. Keller Report ¶¶3-4, 101-105. Dr. Keller explicitly stated that he is not offering an opinion "on survey-based measures of consumer perception." *Id.* ¶3.

In contrast, Dr. Maronick's rebuttal report is based on a new survey that he has conducted measuring consumer perception. Dr Maronick does not address the differences between private labels and branded products at all, even though that is the subject of the report he purports to rebut. Nor does Dr. Maronick analyze any of the evidence that Dr. Keller considered in his report, or any of the methodologies that he employed or analyses that he undertook. This is a textbook example of an untimely affirmative report masquerading as a rebuttal report.

Even if Dr. Keller had submitted an opinion based on a survey, it would have been improper for Dr. Maronick to offer a rebuttal opinion based on a ***new, different type*** of survey. In a recent case, an expert offered an opening "consumer survey report on the likelihood of reverse confusion." *X Soc. Media LLC v. X Corp.*, 2025 WL 1295280, at *1 (M.D. Fla. May 5, 2025). The opposing party served a rebuttal report that was based on a "reverse two-room *Squirt* sequential lineup survey" and a "survey to measure initial-interest confusion." *Id.* The court struck the rebuttal report because the expert it purported to rebut "did not conduct a *Squirt* survey," the rebuttal expert's "*Squirt* survey does not address any of the opinions of" the opening expert, and "[t]he concept of initial-interest confusion was not the subject of" the opening report. *Id.* at *3. According to the court, it did not matter that the survey results in the rebuttal report could "be used to cast doubt on the claims made" in the opening report and "undermine [the other party's] position." *Id.* at *2-3. Here, Dr. Maronick's rebuttal is even less appropriate than the rebuttal in *X Soc. Media* because the report Dr. Maronick purports to rebut does not involve any consumer survey at all.

Dr. Maronick implies that his report is a proper rebuttal because it addresses the same general issue as Dr. Keller's, *i.e.*, whether consumers are likely to perceive Revitalyte as affiliated with Pedialyte. But that does not suffice: a rebuttal report must "explain, repel, counteract, or disprove *evidence* of the adverse party," not simply address the same general issue. *Marmo*, 457 F.3d at 759 (emphasis added). While, at a very high level of generality, Dr. Maronick has addressed one of the same issues offered by Dr. Keller, he is not responding to any of the evidence offered by Dr. Keller. Instead, he is using his new survey to offer the affirmative opinion that "the Current Revitalyte Products do not cause a likelihood of confusion with the Pedialyte Trade Dress" and "corroborate[] and reaffirm[] [his] expert opinion of no likelihood of confusion from my prior survey." Ex. 2 at 23. This general thematic overlap between Dr. Maronick and Dr. Keller's reports does not render the former a proper rebuttal. Were it otherwise, virtually any expert opinion could qualify as a "rebuttal," since all such opinions ultimately bear on the discrete disputed issues in a given litigation.

Courts in this circuit have repeatedly declined to adopt such an expansive approach to rebuttal expert testimony. For example, in *Boston Scientific Corp.*, the affirmative expert's report concluded that, based on the expert's training and experience, one version of a product was effective. 2021 WL 1661255, at *4. The purported rebuttal expert conducted a statistical analysis comparing the relative safety of that version to another version, but did not discuss the first expert's analysis. *Id.* The court held that this was improper rebuttal testimony and, in doing so, rejected the argument that because the first expert "makes a general argument about the effectiveness and safety of one version of the

[product]… that any proffered expert testimony about safety or efficacy would be proper rebuttal." *Id.* Instead, the court "look[ed] to whether [the rebuttal] report explains, repels, counteracts, or disproves evidence proffered by [the first expert], and determine[d] it does not." *Id.* (citing *Marmo*, 457 F.3d at 759).

Similarly, in *Kar*, the rebuttal expert addressed the same specific topic as the first expert: whether "damage to Plaintiffs' roof occurred as the result of the hail and wind storm on July 9-10, 2021." 2025 WL 2305773, at *9. But the first expert was an architect and "based her opinions on inspection of the damage, discussions with the owners, and review of roofing reports, engineering reports, and an insurance estimate." *Id.* The second expert was a weather expert and based his opinion on meteorological conditions. Because the weather expert did not engage with the architect's analysis, and because the question the weather expert addressed had "been at the heart of this dispute since it began," the court struck his expert report. *Id.* at *9-10.

The principles expressed in these cases apply here with even greater force. The general issue that Dr. Maronick is addressing—likelihood of confusion—has been at the heart of this case since it began. If Revitalyte wished to demonstrate the absence of confusion via an *Eveready* survey, it had every opportunity to do so in an affirmative report. And if Revitalyte wished to respond to Dr. Keller's arguments, it had the opportunity to do so in a rebuttal report. The one thing Revitalyte could not do was swap one opportunity for the other. Yet that is the maneuver it has attempted in the Maronick rebuttal report.

Even if this report were Dr. Maronick's first report in this case, it would need to be excluded as an improper rebuttal report under Rule 26(a)(2)(D)(ii). But, as set forth above,

it is not his first report. It is a thinly disguised attempt to replace the deficient report that Dr. Maronick issued in support of Revitalyte's case-in-chief.[5] *See* Ex. 3. Using a rebuttal report to replace or supplement a previously issued affirmative report violates the principle that rebuttal evidence cannot be used to "establish a case-in-chief." *Marmo*, 457 F.3d at 759; *see Kar*, 2025 WL 2305773, at *9 ("Testimony that only offers additional support to an argument made in a case-in-chief is improper on rebuttal.") (citation omitted); *Faith Reg'l Health Servs. v. Ironshore Indem., Inc.*, 2023 WL 1798328, at *3 (D. Neb. Feb. 7, 2023) (finding that, even though defendant's expert was disagreeing with the conclusion expressed by plaintiffs' expert, defendant's expert "is not a rebuttal witness because she was only disclosed to contradict *expected* and *anticipated* portions of Plaintiff's case-in-chief" (emphasis in original)).

Finally, while the Court need not consider the issue of prejudice in order to grant Abbott's motion, it bears noting that Abbott will be greatly prejudiced if Dr. Maronick's report is not stricken. Abbott expended a great deal of time and resources rebutting Dr. Maronick's original report and deposing him on it. If Dr. Maronick is permitted to offer a

---

[5] It was also revealed at Dr. Maronick's deposition that his affirmative report addresses marketplace conditions that do not exist. Specifically, Dr. Maronick admitted that his testimony is limited to situations in which all of the products that were part of the array of images used in his *Squirt* survey appear in the same online marketplace. *See* Ex. 4 (Tr. of Dep. of Dr. Maronick) at 162:8-16; 172:9-20; 195:9-196:4. Dr. Maronick claimed that he identified only one marketplace where such conditions existed: Amazon, where he ran a keyword search for "hydration products" and all the products in his image array then appeared on the same webpage. *See id.* 138:15-141:10; 156:5-9. ***But a search for "hydration products" on Amazon reveals none of the products Dr. Maronick tested***. *See* Ex. 6. Thus, Dr. Maronick's opening report concerns marketplace conditions that do not exist.

new report that addresses the deficiencies that Abbott painstakingly identified, then Abbott's time and effort will have been wasted, and Revitalyte will receive an unfair second bite at the apple—a second bite that comes with the benefit of being able to account for the many deficiencies that Abbott pointed out in Dr. Maronick's first report.

## II. <u>In the Alternative, Abbott Seeks Leave to Depose Dr. Maronick and File a Surrebuttal Expert Report</u>

In the event that the Court does not strike Dr. Maronick's report (which it should), Abbott seeks leave to file a surrebuttal and to depose Dr. Maronick regarding his rebuttal report. Abbott understands that, under the current scheduling order, expert discovery was complete as of October 22, 2025. *Compare* Dkt. 120 at 2 (providing that "[a]ll expert discovery" must be completed by September 26, 2025), *with* Dkt. 132 (extending the deadline for Abbott's opening expert reports to September 24, and the deadline for Revitalyte's rebuttal reports to October 22, but not allowing any time for further expert reports or depositions). Therefore, Abbott requests that the Court modify the scheduling order to allow Abbott three weeks from the date of the Court's order to depose Dr. Maronick and serve a surrebuttal to his report.

"To modify a progression order, a party must show good cause," which it can establish by "show[ing] its diligence in attempting to meet the progression order." *Marmo*, 457 F.3d at 759 (citation omitted). "A district court may also consider the existence or degree of prejudice to the party opposing the modification." *Id.* (citation omitted).

There is good cause here because Abbott has shown diligence. Abbott deposed Dr. Maronick about his prior report and Abbott's expert Dr. Kivetz issued a rebuttal to it in

accordance with the scheduling order. Abbott had no opportunity to do the same things with respect to Dr. Maronick's purported rebuttal report because it was served on the last day of expert discovery. If Dr. Maronick's "rebuttal" report—which is based on an entirely new survey, the format of which Dr. Maronick previously disavowed—is not stricken, it is only fair for Abbott to be able to depose Dr. Maronick again and serve an expert report that rebuts it. And this will not cause any undue prejudice to Revitalyte, who has tried to circumvent the scheduling order by serving an affirmative report masquerading as a rebuttal report.

## CONCLUSION

For the foregoing reasons, Abbott respectfully requests that the Court preclude Dr. Maronick from testifying about the opinions offered in his purported rebuttal report. In the event that the Court does not do so, Abbott respectfully requests that the Court modify the existing scheduling order (Dkt. 120, as modified by Dkt. 132) to allow Abbott three weeks from the date of the Court's order to depose Dr. Maronick and serve a surrebuttal to his report.

Date: November 26, 2025

*/s/ Joseph W. Winkels*
By: Joseph W. Winkels (#349707)
CARLSON, CASPERS, VANDENBURGH & LINDQUIST, P.A.
225 South Sixth Street, Suite 4200
Minneapolis, MN 55402
Telephone (612) 436-9600
Facsimile (612) 436 9605
JWinkels@carlsoncaspers.com

PATTERSON BELKNAP WEBB & TYLER LLP
William F. Cavanaugh, Jr. (*pro hac vice*)
Jane Metcalf (*pro hac vice*)
Julie Simeone (*pro hac vice*)
1133 Avenue of the Americas
New York, New York 10036
Telephone (212) 336-2110
Facsimile (212) 336-2111
wfcavanaugh@pbwt.com
jmetcalf@pbwt.com
jsimeone@pbwt.com