**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Abbott Laboratories,

           Plaintiff,

v.

Revitalyte LLC,

           Defendant.

Civil No. 23-1449 (DWF/DTS)

**<u>FILED UNDER SEAL</u>**

**MEMORANDUM**
**OPINION AND ORDER**

## INTRODUCTION

This matter is before the Court on three motions:  (1) Defendant Revitalyte LLC's

("Revitalyte") motion for summary judgment (Doc. No. 140); (2) Plaintiff Abbott

Laboratories' ("Abbott") motion to preclude expert testimony (Doc. No. 170); and

(3) Abbott's motion to strike Revitalyte's jury demand (Doc. No. 134).  Abbott opposes

the motion for summary judgment.  (Doc. No. 158.)  Revitalyte opposes the motion to

preclude expert testimony but does not oppose the motion to strike.  (Doc. Nos. 150,

186.)  For the reasons set forth below, the Court:  (1) grants in part and denies in part the

motion for summary judgment, (2) grants the motion to preclude expert testimony, and

(3) grants the motion to strike.

## BACKGROUND

Both Abbott and Revitalyte sell oral electrolyte solution ("OES") products, drinks

which are intended to relieve symptoms of dehydration.  (Doc. No. 143 ¶ 5; Doc. No. 160

¶ 8.)  Abbott sells Pedialyte®.[1]  (Doc. No. 160 ¶ 8.)  Revitalyte sells Revitalyte®.[2]  (Doc. No. 143 ¶ 11.)  This litigation involves allegations by Abbott that Revitalyte® products infringe upon Pedialyte®'s trade dress and trademark.

## I.    Plaintiff Abbott Laboratories

Abbott launched Pedialyte® in the 1960s with an intent that it be used by hospitals for treating dehydration in pediatric patients.  (Doc. No. 160 ¶¶ 8, 10.)  The Pedialyte® brand has since expanded beyond the pediatric market and is now also sold to adults for illness-and exercise-related dehydration.  (*Id.* ¶ 10.)  Abbott also briefly advertised Pedialyte® as a remedy for alcohol-related dehydration, also known as a "hangover."  (Doc. No. 145-10 at 46-47, 249-50.)  Abbott's OES products now include Pedialyte® Classic, Pedialyte AdvancedCare® Plus, and Pedialyte® Sport.  (*See* Doc. No. 144-2.)  Abbott controls the OES market with over half of the total sales in the category.  (Doc. No. 160 ¶ 35; Doc. No. 160-6.)

---

[1]    Both the Pedialyte® name and logo are registered trademarks.  (Doc. Nos. 162-2 at 2, 4, 22.)

[2]    The Revitalyte® name is a registered trademark.  (Doc. No. 143-1 at 2.)  When referring to Defendant Revitalyte, LLC, the Court will use "Revitalyte"; when referring to the product, the Court will use "Revitalyte®."

Pedialyte® Classic is sold in the following one-liter bottles:



(Doc. No. 160 ¶ 14.)

Pedialyte AdvancedCare® Plus was introduced in 2017.  (Doc. No. 145-10 at 50.)

Pedialyte AdvancedCare® Plus is sold in the following one-liter bottles:



(Doc. No. 160 ¶ 14.)

Pedialyte® Sport was introduced in 2021.  (Doc. No. 145-10 at 56.)  Pedialyte®

Sport is sold in the following one-liter bottles:



(Doc. No. 160 ¶ 14.)

Each of the above bottles follows Pedialyte®'s alleged trade dress.  Abbott defines

the trade dress as:

> [T]he "overall look and feel" of the products as opposed to any one element
> or group of elements.  The collection of features that contributes to this
> overall look and feel are:  the clear rectangular plastic bottle; the bottle's
> rounded corners; the placement and appearance of the two ridges or "ribs"
> around the bottle's circumference; the placement and appearance of the
> bottle's gently sloping shoulders; the bottle volume of roughly one liter; the
> wrap-around label encircling the middle 50-60 percent of the bottle with the
> name of the product prominently displayed horizontally; the bright colors
> of the various Pedialyte flavors as visible above and below the label; the

color palette, size, and alignment of the wrap-around label; and the size, color palette, and appearance of the shrink-wrapped screw-on.

(Doc. No. 145-9 at 6-7.)  This trade dress has been used since 1986.  (Doc. No. 160 ¶ 13.) The exact bottle specifications have slightly changed, but the general trade dress has stayed consistent.  (*Id.* ¶¶ 14-16, 19.)  The Pedialyte® trade dress is not registered, nor has it ever been registered.  (Doc. No. 144-3 at 98.)

Prior to 1986, Pedialyte® was sold in glass or metal containers.  (Doc. No. 160-1 at 3-4, 13-27.)  Abbott shifted to the plastic bottle because consumer research showed that parents and doctors wanted something non-breakable with the ability to see the fluid level.  (Doc. No. 145-11 at 12-13; *see also* Doc. No. 145-16 at 36.)  Abbott chose a square bottle shape for the plastic container to mimic packaging from sterile irrigation bottles; the medicinal feel communicated to parents that the product was safe and trusted for medical purposes.  (Doc. No. 145-18 at 18-20, 31.)  Abbott also added the shrink-wrap cap to show the consumer if the product had been tampered with.  (*Id.* at 18; Doc. No. 145-16 at 94.)

## II.    Defendant Revitalyte, LLC

Revitalyte launched Revitalyte®, the company's sole product line, in 2017.  (Doc. No. 143 ¶¶ 4-5.)  Revitalyte® is an OES drink catered to young adults seeking relief from alcohol-related dehydration.  (*Id.* ¶¶ 5-6.)  The link with alcohol abuse and other off-color themes is explicit in the company's marketing.  Its social media pages are rife with references to excessive drinking, hangovers, and partying.  (Doc. No. 22 ("Am. Compl.")

¶¶ 135, 143, 145, 155-56, 162-64; *see also* Doc. No. 162-19 at 45 (admitting that the screenshots in the complaint are a true and accurate copy of the posts by Revitalyte).)

Revitalyte® was originally sold in the following bottles:

  

(Doc. No. 143 ¶ 11.)  The shrink-wrapped cap included the "Compare to Pedialyte" text.

(*Id.*)  The back of the wrap-around label included a disclaimer that Revitalyte® was not

associated with Pedialyte®.  (*Id.* ¶ 12.)

Revitalyte later partnered with Barstool Sports and began selling Revitalyte®

Black Label.  (*Id.* ¶ 13.)  The Black Label product mirrored the Revitalyte® one-liter

products but with Barstool branding.  (*See id.*)



(*Id.*)

Revitalyte used PBM Nutritionals, LLC ("PBM")[3] as its manufacturer for the

original Revitalyte® products.  (*Id.* ¶ 9.)  PBM designed and supplied the bottle itself, the

placement of the label, the shrink-wrapped cap, and the "Compare to Pedialyte"

---

[3]    PBM is also known as Perrigo Company.  The Court will refer only to PBM.

language.  (Doc. No. 162-9 at 7.)  Notably, PBM has a trademark for the "block shaped bottle."  (Doc. No. 144-5.)  PBM did not offer another bottle shape.  (Doc. No. 163-33 at 58.)  Revitalyte designed the wrap-around label, supplying the Revitalyte® logo, the raindrop pattern, and the tagline.  (Doc. No. 143 ¶ 10; Doc. No. 162-9 at 7.)  Revitalyte could have further customized by removing the "Compare to Pedialyte" on the shrink-wrapped cap, but chose not to because it would have been more expensive.  (Doc. No. 163-33 at 38-39, 41-42.)

Revitalyte has since ceased production of all one-liter products and no longer uses PBM as a manufacturer.  (Doc. No. 143 ¶ 14.)  Since 2024, Revitalyte has sold only twenty-ounce products.  (*Id.* ¶ 15.)  Currently, Revitalyte® is sold in the following bottles:

  

(*Id.*)

Revitalyte has also expanded their product line to include Revitalyte Zero®, a version of Revitalyte® with no sugar. (*Id.*) Revitalyte Zero® is sold in the following twenty-ounce bottles:

  

(*Id.*)

### III.    Similarities Between Pedialyte® and Revitalyte®

Revitalyte's products and Abbott's products have significant overlap in both function and appearance. Revitalyte admits that this was purposeful. Revitalyte's goal was to be an adult version of Pedialyte®—the same product but purchased in the liquor store instead of having to go to the baby aisle. (Doc. No. 143 ¶ 6.) The name "Revitalyte" was intended to reference Pedialyte® and the concept of revitalizing an adult after a hangover. (*Id.* ¶ 7; Doc. No. 162-15 ¶ 15 (admitting that Revitalyte® purposely rhymes with Pedialyte®).) Additionally, Revitalyte used a square bottle to communicate that the product was part of the OES category. (Doc. No. 163-34 at 64.)

The Revitalyte® bottles and branding were intended to match the OES product category and Pedialyte® as the category leader.  (*See* Doc. No. 163-33 at 15; Doc. No. 163-34 at 46-47.)

Revitalyte's marketing strategy has leaned into the similarity with Pedialyte®. Revitalyte's website said it was the "same electrolyte formula found in the baby aisle." (Doc. No. 160-17 at 3; *see also* Doc. No. 163-34 at 40 (clarifying that this reference to the baby aisle is a reference to Pedialyte®).)  Revitalyte's website also included screenshots of social media posts discussing Pedialyte® by name.  (Doc. No. 162-1 at 4.) Further, Revitalyte advertised its products using a comparison to Pedialyte®.  (*E.g.*, Doc. No. 163-5 (advertising to potential vendors).)

Such efforts to align with Pedialyte® and the OES category more broadly have resulted in confusion amongst consumers.  For example, one social media post called Revitalyte® "Revitalyte by Pediatlyte."  (Am. Compl. ¶ 125.)  Similarly, social media posts have called Revitalyte® Black Label Barstool's version of Pedialyte®.  (*Id.* ¶¶ 123, 126.)  And Revitalyte has not shut down this confusion, instead sharing those posts on its social media pages.  (Doc. Nos. 162-7, 162-26 through 162-29.)  Further, numerous comments on Revitalyte's social media pages have shown confusion.  (Doc. Nos. 162-10, 162-12, 162-13, 162-25.)

## IV.    The Current Litigation

In May 2023, Abbott filed the current action against Revitalyte.  (Doc. No. 1.) Abbott claims trade dress infringement (Count I); trademark infringement (Count II); unfair competition, false designation of origin, and false advertising (Count III);

trademark and trade dress dilution by tarnishment (Count IV); and violation of the

Minnesota Deceptive Trade Practices Act ("MDTPA") (Count V).  (Am. Compl.

¶¶ 170-203.)

There are currently three motions pending before the Court.  First, Revitalyte

moves for summary judgment as to all claims.  Second, Abbott moves to exclude the

rebuttal expert testimony of Dr. Thomas Maronick.  Third, Abbott moves to strike

Revitalyte's jury demand.

## DISCUSSION

### I.      Motion for Summary Judgment

#### A.      Legal Standard

Summary judgment is proper if the moving party shows that there are no genuine

issues of material fact and that they are entitled to judgment as a matter of law.  Fed. R.

Civ. P. 56(a); *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996).  A

party opposing a properly supported motion for summary judgment must demonstrate the

existence of specific facts in the record that create a genuine issue for trial.  *Krenik v.*

*County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995).  "[A] genuine issue of material fact

exists if:  (1) there is a dispute of fact; (2) the disputed fact is material to the outcome of

the case; and (3) the dispute is genuine, that is, a reasonable jury could return a verdict

for either party."  *RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.*, 49 F.3d 399, 401 (8th

Cir. 1995).  The Court must view the evidence and the inferences that may be reasonably

drawn from the evidence in the light most favorable to the nonmoving party.  *Weitz Co. v.*

*Lloyd's of London*, 574 F.3d 885, 892 (8th Cir. 2009).

### B.   Count I:  Trade Dress Infringement

In Count I, Abbott alleges that Revitalyte® infringes upon the Pedialyte® trade dress, in violation of 15 U.S.C. § 1125(a).  (Am. Compl. ¶ 177.)  To establish a trade dress infringement claim under 15 U.S.C. § 1125(a)(1), a party must demonstrate that its trade dress "(1) [is] inherently distinctive or [has] acquired distinctiveness through secondary meaning; (2) [is] nonfunctional; and (3) its imitation would result in a likelihood of confusion in consumers' minds as to the source of the product."  *Gateway, Inc. v. Companion Prods., Inc.*, 384 F.3d 503, 507 (8th Cir. 2004).  The burden to prove each element is on the party claiming trade dress—in this case, Abbott.  *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 30 (2001).

To be protectable, a trade dress must be distinctive.  "A mark is inherently distinctive if its intrinsic nature serves to identify a particular source."  *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 210 (2000) (citation modified).  Alternatively, a plaintiff can show distinctiveness by showing that the dress has acquired a secondary meaning—that is, "in the minds of the public, the primary significance of [the] mark is to identify the source of the product rather than the product itself."  *Id.* at 211 (citation modified).  This is a fact-intensive inquiry into whether consumers have come to associate a mark—or trade dress—with a particular source.  *Nat'l Presto Indus., Inc. v. U.S. Merchs. Fin. Grp., Inc.*, 121 F.4th 671, 681 (8th Cir. 2024).

Secondary meaning can be proven either through direct or circumstantial evidence.  *E.g., id.*  Direct evidence includes consumer surveys and testimony of consumers.  *Aromatique, Inc. v. Gold Seal, Inc.*, 28 F.3d 863, 871 (8th Cir. 1994).

13

Abbott has not put forth any direct evidence.[4]  While not dispositive, this weighs in favor

of Revitalyte because the ultimate question is one of consumer association.  *See Frosty*

*Treats, Inc. v. Sony Comput. Ent. Am., Inc.*, 426 F.3d 1001, 1005 (8th Cir. 2005) (noting

that direct evidence is "most probative of secondary meaning"); *Two Pesos, Inc. v. Taco*

*Cabana, Inc.*, 505 U.S. 763, 770-71 (1992) (explaining that secondary meaning is a

question of consumer association).  The circumstantial evidence put forth by Abbott

includes Abbott's advertising expenditures, Pedialyte®'s unit sales, proof of Revitalyte's

intent to copy Pedialyte®, and instances of actual confusion by consumers.

Advertising expenditures are probative of secondary meaning if the

advertisements "cause the public to equate the mark with the source of the product."  *Co-*

*Rect Prods., Inc. v. Marvy! Advertising Photo., Inc.*, 780 F.2d 1324, 1332 (8th Cir. 1985).

If "advertising promote[s] the product's functions and appearance, not its source," the

advertising expenditures are not probative.  *Nat'l Presto*, 121 F.4th at 682.  The record

does not include advertisements specific to the source; the Pedialyte® advertisements in

the record focus on function.  For example, Abbott advertised the resealable cap, ability

to pour and measure, and visibility of the liquid as "conveniences" to parents.  (Doc.

No. 160-8 at 2.)  The advertising expenditures are therefore not strong evidence of

secondary meaning.

---

[4]    Given that Abbott did commission an expert on a related issue, that omission is telling.  *See LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 657 & n.57 (S.D.N.Y. 2016) (discussing plaintiff's burden to show secondary meaning).

14

Unit sales are probative of secondary meaning if the sales can be traced to the use of the claimed trade dress. *See Aromatique*, 28 F.3d at 873. If "something other than the secondary meaning of the trade dress may have been responsible for the success of the product," evidence of sales does "not provide the basis for an inference of secondary meaning." *Id.* Pedialyte®'s sales are impressive, but there is no indication that the trade dress specifically was responsible. The unit sales are likewise not strong evidence of secondary meaning.

Evidence of a deliberate intent to copy indicates secondary meaning because it implies that there is something to gain from association. *See, e.g., id.* at 871. However, when a defendant clearly labels its products with its own trademark, the inference of secondary meaning is rebutted. *See id.*; *Nat'l Presto*, 121 F.4th at 682. There is ample evidence of Revitalyte aligning itself with Pedialyte®—both implicitly and explicitly. But any such inference of copying is rebutted by Revitalyte's distinction of Revitalyte® from Pedialyte®. First, the Revitalyte® trademark was used conspicuously on the bottle. *See Aromatique*, 28 F.3d at 871 (explaining that the conspicuous use of identifying marks serves to distinguish the allegedly infringing product). Similarly, Revitalyte used an express disclaimer that they were not associated with Pedialyte®. *Cf. Pfizer, Inc. v. Perrigo Co.*, 988 F. Supp. 686, 700 (S.D.N.Y. 1997) (finding that the use of a "compare to" disclaimer showed that defendant intended to compete, not to deceive). The evidence suggests that Revitalyte intended to compete and thus is not sufficient to establish secondary meaning.

15

Lastly, Abbott points to numerous documented instances of consumer confusion. Consumer confusion can be evidence of secondary meaning because it indicates that a consumer associates the trade dress as coming from one source. *See, e.g.*, *Stuart Hall Co. v. Ampad Corp.*, 51 F.3d 780, 789 (8th Cir. 1995). Here, any evidence of secondary meaning presented by Abbott is refuted by the ample evidence of third-party products with similar packaging because it shows a lack of exclusive use. When there are similar components used among various products, it is more difficult for a consumer to attribute that feature to any one source. *Nat'l Presto*, 121 F.4th at 682-83. Revitalyte has presented many examples of third-party products that use a similar trade dress to the one claimed by Pedialyte®. (*See* Doc. No. 142 at 33-40 (providing 141 examples of similar products).) Indeed, the USPTO, in a letter denying PBM's application to register the square bottle trade dress, explained that the applied-for mark was not inherently distinctive because "it is a common practice in the industry to market electrolyte replacement solutions . . . [in] bottles with narrow necks that slope down to straight sides." (Doc. No. 144-6 at 3.) Even more telling, the Pedialyte® bottle design was based off medical irrigation bottles. Any claim that the bottle's features are indicative of only one source is belied by the fact that the bottle design was initially copied from a different type of product. *See, e.g.*, *Aromatique*, 28 F.3d at 870 (discussing the need for exclusive use). The ubiquity of the square bottle shape in the OES market and in medical packaging suggests that it cannot be attributed to a single source in the minds of consumers.

Abbott counters that the third-party products with potential to confuse are private label brands, which are less likely to confuse a consumer than Revitalyte®.  (*See* Doc. No. 158 at 52-53.)  As part of this litigation, Abbott retained Dr. Kristopher Keller to assess whether Revitalyte® products were consistent with private label brands and how consumer perceptions would influence consumer association between Pedialyte® and Revitalyte®.  (Doc. No. 174 ¶ 1.)  Dr. Keller concluded that Revitalyte® exhibits characteristics of a branded product, which increases the likelihood that consumers will mistake Revitalyte® as part of, instead of alternative to, Pedialyte®.  (*Id.* ¶¶ 102-03.)  But regardless of whether consumers think Revitalyte® is a private label or national brand, the market is still saturated.[5]  *See Versa Prods. Co. v. Bifold Co. (Mfg.) Ltd.*, 50 F.3d 189, 216 (3d Cir. 1995) ("The use of private labelling undermines a claim that a product's appearance denotes its source, because consumers will be less likely to associate the multifariously labeled product with a *single* source.").  Abbott cannot show the exclusive use of the trade dress required to establish secondary meaning.

Abbott has failed to show a genuine dispute of material fact as to the distinctiveness of Pedialyte®.[6]  The claimed Pedialyte® trade dress is therefore not

---

[5]     Even accepting Dr. Keller's report and not considering the rebuttal by Dr. Maronick, Abbott has not met their burden to show secondary meaning.  The Court addresses the admissibility of the rebuttal below.

[6]     The Court acknowledges that a judge in the Southern District of Indiana found that the Pedialyte trade dress had acquired distinctiveness in 1991.  *See Abbott Lab'ys v. Mead Johnson & Co.*, 1991 U.S. Dist. LEXIS 21010, at *116-17 (S.D. Ind. Oct. 10, 1991) (finding secondary meaning for the purpose of a preliminary injunction), *vacated and remanded*, 971 F.2d 6, 20 (7th Cir. 1992) (noting that the district court found that Abbott had demonstrated distinctiveness but not analyzing the issue).  There, the district

protectable.  The Court's inquiry ends here; the Court need not continue to

nonfunctionality and likelihood of confusion when there is no acquired distinctiveness.

### C.    Count II:  Trademark Infringement

In Count II, Abbott alleges that Revitalyte infringed the Pedialyte® trademark by

using "Compare to Pedialyte" on the Revitalyte® bottles in violation of 15 U.S.C.

§ 1114.[7]  (Am. Compl. ¶ 179.)  To succeed on the claim, Abbott must prove that it has a

valid, protectable mark and that Revitalyte used the mark "in connection with goods or

services in a manner likely to cause consumer confusion as to the source or sponsorship

of the goods or services."  *Cmty. of Christ Copyright Corp. v. Devon Park Restoration*

*Branch of Jesus Christ's Church*, 634 F.3d 1005, 1009 (8th Cir. 2011); *see also Calvin*

*Klein Cosmetics Corp. v. Lenox Lab'ys, Inc.*, 815 F.2d 500, 503-04 (8th Cir. 1987)

(explaining that an imitator may use another's trademark to advertise similarities so long

as it is not likely to create confusion as to the source).  The Pedialyte® trademark is

---

court relied on a consumer survey from Abbott's expert finding a "very high level of recognition."  *Id.* at *117.  However, the defendant there did not dispute secondary meaning at that stage of the proceedings, so the court did not consider counterarguments. *Id.*  Here, Abbott produced no such survey, and the issue is disputed.  Moreover, a decision from 1991 is not necessarily persuasive because market conditions change.  As noted, today, there are many brands that use a similar trade dress, which may indicate that any secondary meaning has been lost.  *See generally RVC Floor Decor, Ltd. v. Floor and Decor Outlets of Am., Inc.*, No. 18-cv-6449, 2024 WL 2847139, at *13 (E.D.N.Y. June 5, 2024) (discussing changes in consumer recognition).  This past finding does not change the Court's view today.

[7]    Revitalyte stopped using the "Compare to Pedialyte" language.  However, that does not moot Abbott's claim of trademark infringement.  *See, e.g.*, *Snap Fitness, Inc. v. Scenic City Fitness, Inc.*, No. 24-cv-2803, 2024 WL 4528877, at *6 (D. Minn. Oct. 18, 2024).

registered and therefore entitled to a presumption of validity.  *See Aromatique*, 28 F.3d at 869.  Revitalyte does not dispute the validity of the Pedialyte® trademark.  The Court's inquiry is therefore limited to the likelihood of confusion.

Likelihood of confusion is a question of fact.  *SquirtCo. v. Seven-Up Co.*, 628 F.2d 1086, 1091 (8th Cir. 1980).  The Court looks at six factors when determining whether a defendant used a mark in a manner likely to cause customer confusion:

> (1) the strength of the owner's mark; (2) the similarity between the owner's mark and the alleged infringer's mark; (3) the degree to which the products compete with each other; (4) the alleged infringer's intent to "pass off" its goods as those of the trademark owner; (5) incidents of actual confusion; and (6) the type of product, its costs and conditions of purchase.

*Co-Rect Prods.*, 780 F.2d at 1330.  None of these factors are dispositive; rather, the inquiry is case-specific.  *See, e.g.*, *Frosty Treats*, 426 F.3d at 1008.

The parties put forth many arguments on the above factors as it related to the trade dress infringement.  However, neither party put forth much argument on the trademark claims.  At summary judgment, Revitalyte must demonstrate why it is entitled to judgment as a matter of law.  With only minimal arguments, the Court is hesitant to grant summary judgment on this claim.

Regardless, the Court finds evidence in support of each party's position sufficient to deny summary judgment.  For example, Revitalyte® and Pedialyte® are similar products and compete in the same general category, which indicates that they are likely to be confused.  *See Kemp v. Bumble Bee Seafoods, Inc.*, 398 F.3d 1049, 1056 (8th Cir. 2005) (explaining that any competition, even indirect, may indicate likelihood of confusion).  But Revitalyte® and Pedialyte® have different target audiences and different

retail locations, which cuts against likelihood of confusion.  *See Grato Holdings, Inc. v. JB7, LLC*, No. 24-cv-009, 2026 WL 226895, at \*14-15 (S.D. Iowa Jan. 28, 2026) (finding that the competition factor weighed in favor of no likelihood of confusion when parties "focused their marketing and sales efforts on separate channels").  As another example, Abbott has put forth ample evidence of Revitalyte's intent to align with the Pedialyte® name, even purposely rhyming with Pedialyte®, which indicates an intent to "pass off" Revitalyte® as part of Abbott.  *See Luigino's, Inc. v. Stouffer Corp.*, 170 F.3d 827, 830-31 (8th Cir. 1999) (discussing how similarity in the form, spelling, and sound of names can cause confusion).  But Revitalyte's use of the "compare to" statement and their own branding indicates an intent to differentiate.  *See Conopco, Inc. v. May Dep't Stores Co.*, 46 F.3d 1556, 1571 (Fed. Cir. 1994) (finding that a "compare" statement "draws a clear distinction" between products).

Based on the evidence in the record, there is a material question of fact as to likelihood of confusion between the Revitalyte® mark and the Pedialyte® mark. Summary judgment is therefore denied as to the trademark infringement claim.

**D.    Count III:  Unfair Competition, False Designation of Origin, and False Advertising**

In Count III, Abbott alleges that Revitalyte's use of both the Pedialyte® trademark and trade dress are likely to confuse consumers as to the source of the product, constituting false designation of origin and misleading description and representation of fact.  (Am. Compl. ¶¶ 184-85.)  Having found that the claimed trade dress is not protectable, the Court need only address this claim as to the trademark infringement.  *See,*

20

*e.g.*, *Children's Factory, Inc. v. Benee's Toys, Inc.*, 160 F.3d 489 (8th Cir. 1998) (affirming dismissal of trade dress infringement and unfair competition claims because the products were not inherently distinctive and had not acquired secondary meaning.)

The trademark portion of Count III follows Count II.  A false designation claim requires the same likelihood of confusion as a trademark infringement claim.  *E.g.*, *Cmty. of Christ Copyright Corp.*, 634 F.3d at 1009; *see also Zerorez Franchising Sys., Inc. v. Distinctive Cleaning, Inc.*, 103 F. Supp. 3d 1032, 1040 (D. Minn. 2015) (applying the rule when a mark is registered).  For the reasons discussed above, there is a material question of fact as to likelihood of confusion.  Summary judgment is denied as to the unfair competition claim insofar as it is based on the Pedialyte® trademark.

## E.    Count IV:  Trademark and Trade Dress Dilution

In Count IV, Abbott claims trademark and trade dress dilution by tarnishment under 15 U.S.C. § 1125(c).  (Am. Compl. ¶¶ 191-93.)  Trademark dilution occurs when another person uses a famous mark in commerce in a manner that is likely to create an association between the mark and the famous mark.  15 U.S.C. § 1225(c)(1); *see also Luigino's*, 170 F.3d at 832.

The threshold requirement for a dilution claim is that the mark is "famous," meaning the mark "is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner." 15 U.S.C. § 1225(c)(2)(A).  The bar for fame is higher than the bar for secondary meaning for purposes of an infringement claim.  *See Am. Dairy Queen Corp. v. W.B. Mason Co.*, No. 18-cv-693, 2022 WL 2760024, at *79 (D. Minn. July 14, 2022).

21

Because the Court found that the Pedialyte® trade dress has not acquired secondary meaning, it follows that the trade dress is not "famous" for purposes of a dilution claim. The trade dress dilution claim must be dismissed. However, Revitalyte does not dispute the famousness of the Pedialyte® mark. Thus, the Court must analyze the trademark dilution claim.

The textbook example of trademark dilution by tarnishment is the association of a mark with an unsavory context. *See* 3 *McCarthy on Trademarks and Unfair Competition* § 24:89 (5th ed. 2026) (listing crude humor and drug culture as associations that can tarnish a mark). Revitalyte readily associates its brand with alcohol abuse and uses a crude advertising approach. A reasonable fact finder could easily determine that associations with alcohol abuse and suggestive images would tarnish Pedialyte®, a product centered on health and, often, children's health specifically. *See generally Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 110 (2d Cir. 2009) (collecting cases discussing tarnishment because defendant's mark was unsavory). On the other hand, Abbott did, at one point, advertise Pedialyte® as a cure for hangovers. A reasonable fact finder may instead decide that Abbott's own attempts to identify with that market indicate that associations with alcohol are not a tarnishment to the brand. *Cf. id.* at 110-11 (finding that similar marketing undercuts a claim of reputational harm). This factual question precludes summary judgment.

Revitalyte briefly argues that the use of the "compare to" statement mitigates any risk of reputational harm because consumers know they are separate products. (Doc. No. 142 at 58-59.) Federal law specifically exempts comparative advertising from

dilution claims. 15 U.S.C. § 1225(c)(3); *see also Deere & Co. v. MTD Prods., Inc.*, 41F.3d 39, 44 (2d Cir. 1994) ("[Comparative advertisements] serve[] the beneficial purpose of imparting factual information about the relative merits of competing products and poses no risk of diluting the selling power of the competitor's mark."). Use of the "compare to" language rebuts the idea that Revitalyte is trying to create an association with Pedialyte®. *E.g.*, *Toni & Guy (USA) Ltd. v. Nature's Therapy, Inc.*, No. 03-cv-2420, 2006 WL 1153354, at *13 (S.D.N.Y. May 1, 2006) (granting summary judgment for defendant because the product included comparative language clearly indicating it was not associated with plaintiff); *cf. Louis Vuitton Malletier, S.A. v. My Other Bag, Inc.*, 156 F. Supp. 3d 425, 436-37 (S.D.N.Y. 2016) (emphasizing defendant's clear language— there, in parody form—indicating that its product was not from plaintiff in granting summary judgment for defendant on dilution by tarnishment claim).

However, the comparative advertisement exception only applies if the user does not do anything to suggest sponsorship or endorsement. *E.g.*, *Speed RMG Partners, LLC v. Arctic Cat Sales Inc.*, No. 20-cv-609, 2022 WL 1090605, at *16 (D. Minn. Apr. 11, 2022); *see also Merck & Co., Inc. v. Mediplan Health Consulting, Inc.*, 425 F. Supp. 2d 402, 417 (applying the infringement-claim comparative advertisement analysis to a dilution claim). Revitalyte's attempts to align with Pedialyte® go far beyond a mere "Compare to Pedialyte" statement on the bottle. There are multiple documented examples of Revitalyte reposting social media posts that describe Revitalyte® as owned by Pedialyte® and Revitalyte did not correct that factual error. In some of those posts, there is either no Revitalyte® bottle or no shrink-wrapped seal, so the comparative

language is not present to clarify the lack of a relationship. Those advertisements suggest sponsorship by Pedialyte®, which distinguishes this case from those which allow comparative use. In sum, Revitalyte does not clearly distinguish its product from Pedialyte® to invoke the comparative advertisement exception.

The motion for summary judgment is granted as to Abbott's trade dress dilution claim. The motion is denied as to the trademark dilution claim.

### F.    Count V:  Minnesota Deceptive Trade Practices Act

Lastly, in Count V, Abbott alleges violations of MDTPA. (Am. Compl. ¶¶ 196-203.) Both parties agree that the outcome for the state-law claims mirror the outcome of the corresponding federal laws. (Doc. No. 142 at 59; Doc. No. 158 at 64 n.11; *see also, e.g., Am. Dairy Queen Corp.*, 2022 WL 2760024, at *91 (collecting cases).) The state-law parallels of the trade dress claims fail; the state-law parallels of the trademark claims survive.

## II.    Motion to Preclude Expert Testimony

Abbott moves to preclude the expert testimony of Dr. Maronick offered to rebut the expert testimony of Dr. Keller.[8] (Doc. No. 170.) A party is permitted to offer evidence that "is intended solely to contradict or rebut evidence on the same subject matter identified by another party." Fed. R. Civ. P. 26(a)(2)(D)(ii). Such evidence is

---

[8]    The parties only used the two reports in relation to the trade dress claims and the reports seem to only address likelihood of confusion due to the trade dresses. However, the likelihood of confusion analysis is relevant to the trademark claims, as well. Because of the potential significance of the expert reports for the trademark analysis, the motion is not moot.

24

used to "explain, repel, counteract or disprove evidence of the adverse party." *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 759 (8th Cir. 2006) (quoting *United States v. Lamoreaux*, 422 F.3d 750, 755 (8th Cir. 2005)). "[R]ebuttal evidence may be used to challenge the evidence or theory of an opponent—and not to establish a case-in-chief." *Id.* A rebuttal expert "may only respond to evidence offered by the defendant." *Hein v. Deere & Co.*, No. C11-113, 2013 WL 3816699, at *10 (N.D. Iowa July 22, 2013).

Dr. Keller's report analyzed whether Revitalyte is better described as a private label brand or a national brand by applying the "4Ps" framework: place, product, price, and promotion. (Doc. No. 174 ¶¶ 15, 22-23.) He concluded that Revitalyte exhibits the hallmarks of a national brand. (*Id.* ¶¶ 23, 102.) He further opined that, as a result of the positioning as a national brand, a meaningful segment of consumers is likely to perceive that Revitalyte® is associated with Pedialyte® (as opposed to an alternative to Pedialyte®). (*Id.* ¶¶ 24, 103.) These conclusions were based entirely on his own analysis; he did not conduct any sort of survey. (*See id.* ¶ 12.)

Dr. Maronick's rebuttal report responded only to the conclusion about consumer confusion. (Doc. No. 173-2 at 8.) To refute that conclusion, he created a survey to measure the confusion rate between Pedialyte® and Revitalyte® bottles. (*See id.* at 14-18.) The survey showed a *de minimus* net confusion rate, so Dr. Maronick concluded that consumers are not likely to confuse the two brands. (Doc. No. 173-2 at 22-24.) The rebuttal did not address the issue of national brands versus private labels, nor the 4Ps framework, whatsoever.

Dr. Keller's report addressed a specific topic: how a brand's marketing and positioning in the marketplace impacts consumer perception. The rebuttal addressed only potential confusion due to the appearance of the bottles. Even if using a different approach, Dr. Maronick's rebuttal testimony must have engaged with the 4Ps framework or addressed the central question of national brand versus private label. *See Kar v. Safeco Ins. Co. of Am.*, No. 23-cv-207, 2025 WL 2305773, at *9 (E.D. Mo. Aug. 8, 2025) (explaining that a rebuttal must engage with the analysis from the expert report, even if it uses a different methodology to disprove it); *Hein*, 2013 WL 3816699, at *10 (explaining that rebuttal must be directed at the new theories or evidence presented). Because he did not respond to Dr. Keller's methodology or main inquiry, Dr. Maronick's report was not a proper rebuttal.

### III.    Motion to Strike Jury Demand

Finally, Abbott moves to strike Revitalyte's jury demand. (Doc. No. 134.) The motion is unopposed. (*See* Doc. No. 150.) Further, Abbott has made clear that it does not seek damages, only disgorgement. (*See* Am. Compl. at 73; Doc. No. 136 at 12.) Such equitable relief does not entitle a party to trial by jury. *See Nat'l Presto*, 121 F.4th at 680 (affirming denial of request for jury trial for disgorgement claim under the Lanham Act). The Court therefore grants the motion and strikes the request for a jury trial.

### CONCLUSION

The claimed Pedialyte® trade dress does not have either inherent or acquired distinctiveness and is therefore not entitled to protection. Summary judgment is granted in favor of Revitalyte on Abbott's trade dress claims. There remains a question of fact as

to whether Revitalyte's use of the Pedialyte® trademark is likely to cause consumer confusion.  Summary judgment is denied as to Abbott's trademark claims.  Additionally, the motions to preclude expert testimony and to strike the jury demand are granted.

**ORDER**

Based upon the foregoing and the record in this case, **IT IS HEREBY ORDERED** that:

1.    Defendant Revitalyte LLC's motion for summary judgment (Doc. No. [140]) is **GRANTED IN PART AND DENIED IN PART** as follows:

   a.    The motion is **GRANTED** as to Count I and Counts III, IV, and V's trade dress claims.  Those claims are **DISMISSED WITH PREJUDICE**.

   b.    The motion is **DENIED** as to Count II and Counts III, IV and V's trademark claims.

2.    Plaintiff Abbott Laboratories' motion to preclude expert testimony (Doc. No. [170]) is **GRANTED**.

3.    Plaintiff Abbott Laboratories' motion to strike Defendant Revitalyte LLC's jury demand (Doc. No. [134]) is **GRANTED**.

4.    Defendant Revitalyte LLC's jury demand (Doc. No. [25]) is **STRICKEN**.

Dated:  April 30, 2026                    s/Donovan W. Frank
                                          DONOVAN W. FRANK
                                          United States District Judge